632 F.2d 788
 24 Fair Empl.Prac.Cas. 289,
24 Empl. Prac. Dec. P 31,378
AG 1 Dennis R. BELLER, Plaintiff-Appellant,
v.
The Honorable J. William MIDDENDORF, Secretary of the Navy,
et al.,Defendants-Appellees.
James Lee MILLER, Plaintiff-Appellant,
v.
Donald H. RUMSFELD, Secretary of Defense, et al.,
Defendants-Appellees.
Mary Roseann SAAL, Plaintiff-Appellee,
v.
J. William MIDDENDORF, Secretary of the United States Navy,
in his officialcapacity, Defendant-Appellant.
 Nos. 77-1354, 77-1671 and 77-2461.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Nov. 8, 1978.
Decided Oct. 23, 1980.
Rehearing Denied in No. 77-1354 Nov. 21, 1980.
 
 Richard P. Fox, Los Angeles, Cal., for Beller.
 John Vaisey, San Francisco, Cal., for Miller.
 James L. Browning, Jr., San Francisco, Cal., on brief; Harland F. Leathers, Washington, D.C., Mary C. Dunlap, San Francisco, Cal., for Middendorf.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING and KENNEDY, Circuit Judges, and CHRISTENSEN,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 Although the factual and procedural settings of these three consolidated appeals differ, the broad outlines are similar: an enlisted person in the Navy, with an otherwise fine performance record, admitted engaging in homosexual acts, conduct prohibited by Navy regulations. Following proceedings before an administrative discharge board and review by the Secretary of the Navy, each was ordered discharged. Plaintiffs raise constitutional challenges to the Navy's regulations and proceedings. We recognize that to many persons the regulations may seem unwise, but if that be the case the political branches of the Government, which most certainly are on notice of the controversy here or in similar cases, have the right and the prerogative to declare a different policy. Our role is more confined. We are limited to determining whether or not the Constitution prohibits the Navy from adopting the rule before us. We cannot say that constitutional limitations have been exceeded here, and therefore we do not find the regulation is invalid.
 
 
 2
 We first state the relevant facts of each case, relying extensively on the respective district court opinions.
 
 
 3
 * Saal
 
 
 4
 Plaintiff Mary Saal enlisted in the United States Navy on December 17, 1971. Following training she was assigned as an air traffic controller at Alameda Naval Air Station. In January, 1972, she entered into a three-year enlistment contract. In March, 1973, after an investigation by the Navy into plaintiff's activities, she signed a statement admitting homosexual relations with another Navy member assigned to the Air Operations Department. Thereafter, administrative proceedings to separate plaintiff were instituted pursuant to Navy regulations. An administrative discharge board was convened on July 6, 1973, and, after a hearing, it recommended on the basis of plaintiff's admitted homosexual activity that she should be separated from the service with a general discharge. At the hearing Saal admitted to having had homosexual relations since her March statement and indicated that she intended to continue her homosexual relationship.
 
 
 5
 This action was filed on July 27, 1973, seeking injunctive relief to prevent the Navy from discharging plaintiff for her homosexual activity as well as damages for back pay and lost promotional opportunities. In August, 1973, the district court granted preliminary injunctive relief staying the discharge pending a decision on the merits. In November, 1973, the Chief of Naval Personnel notified plaintiff that he had directed her separation with a general discharge, although the discharge remained stayed by court order. In January, 1974, defendant moved for summary judgment contending that (1) plaintiff had failed to exhaust her administrative remedies, (2) the administrative hearing accorded plaintiff satisfied due process, and (3) the discharge was lawful. On July 10, 1974, the district court denied the motion, rejecting the first contention and holding that the other two contentions were not ripe for disposition by summary judgment.
 
 
 6
 With the term of her enlistment contract nearing its end, plaintiff in September, 1974 submitted a written request for extension to her commanding officer in accordance with Navy regulations. The commanding officer, aware of the pending litigation and not wanting to take action which might affect it, forwarded the request without recommendation to the Chief of Naval Personnel, the final authority in such matters, and asked for advice. On December 12, 1974, the Chief of Naval Personnel replied by denying plaintiff's request for extension and ordering her separation with an honorable discharge upon expiration of her enlistment. The prior directive ordering her discharge by reason of unfitness was cancelled and her discharge was "characterized as warranted by the average performance evaluation marks which have been earned during her period of service." At the same time, plaintiff was assigned a reenlistment code of RE-4, which designates a person as ineligible for reenlistment.
 
 
 7
 Plaintiff's enlistment expired on January 6, 1975. Defendant immediately moved to dismiss this action as moot. By order dated August 19, 1975, the district court granted the motion, lifted the prior stay order (thereby permitting issuance of an honorable discharge to plaintiff), but gave plaintiff leave to file an amended complaint. On August 22, 1975, plaintiff was discharged from the Navy. On September 15, 1975, she filed her first amended complaint in which she contended she was deprived of due process by reason of having been rendered ineligible for reenlistment under Instruction 1900.9A. In the amended complaint plaintiff sought declaratory, injunctive, and monetary relief. The district court granted partial summary judgment for Saal, holding due process required that plaintiff's application for extension of service or reenlistment receive the same consideration as that of other Navy personnel similarly situated without reference to policies or regulations substantially mandating exclusion or processing for discharge of persons who engage in homosexual activity. Saal v. Middendorf, 427 F.Supp. 192 (N.D.Cal.1977).
 
 Miller
 
 8
 Plaintiff James Miller, currently a Yeoman Second Class, enlisted in the Navy in February, 1965. He had reenlisted twice, the most recent reenlistment being in 1972 for a period of six years. As a result of an unrelated incident, a Naval Investigative Service (NIS) inquiry began in 1975, and in an interview with the NIS investigator, after being advised of his rights, plaintiff admitted that he had participated recently in homosexual acts with two Taiwanese natives while he was stationed in Taiwan. Pursuant to orders issued prior to the institution of the NIS investigation, plaintiff was transferred to the USS ORISKANY at Alameda, California. He served on board for over one year and was given a Secret clearance by his commander, who had knowledge of the NIS investigation.
 
 
 9
 On April 12, 1976, a hearing board was convened to consider Miller's discharge for homosexuality. The board heard testimony from the NIS investigator, several witnesses as to Miller's good character and service in the Navy, and Miller on his own behalf. It found that plaintiff had admitted to committing homosexual acts during his assignment in Taiwan, but nevertheless recommended, by vote of two to one, that plaintiff be retained in the Navy. The dissenting member of the board voted that plaintiff be administratively discharged under honorable conditions.
 
 
 10
 Plaintiff was subsequently examined by the Senior Medical Officer who found that despite plaintiff's admitted homosexual episodes, he did not appear to be "a homosexual," and that he found no evidence of psychosis or neurosis. The medical officer recommended retention. The convening authority, the Commanding Officer of the USS ORISKANY, then forwarded the board proceedings to the Chief of Naval Personnel and recommended that plaintiff be retained in the Navy.
 
 
 11
 The Assistant Director of the Enlisted Performance Division recommended that plaintiff be separated with a General Discharge under honorable conditions by reason of misconduct, for his admitted participation in in-service homosexual acts. That recommendation was approved by the Assistant Secretary of the Navy and plaintiff was then scheduled for separation on June 23, 1976.
 
 
 12
 On that date, Miller brought suit in the district court, asking that his discharge be restrained and in the alternative that he be given not less than an honorable discharge. The Chief of Naval Personnel subsequently ordered Miller separated with an honorable discharge, but this discharge was stayed by the district court until, relying largely on its decision in Beller, it granted summary judgment for the Navy. This court, however, stayed Miller's discharge pending disposition of this appeal. Miller has been retained in the Navy pursuant to this court's order. He currently works for the Commanding Officer, Enlisted Personnel, Treasure Island. His commanding officer there requested that the Navy retain him.
 
 
 13
 Miller has tried to reenlist; the Navy denied his application.
 
 Beller
 
 14
 Plaintiff Dennis Beller enlisted in the United States Navy in 1960. On August 29, 1972, he reenlisted for a six-year term. In the latter part of 1975 plaintiff was informed that the Navy desired to upgrade his security clearance to permit him access to "Top Secret" information. During the course of a routine background investigation of plaintiff, Navy personnel discovered that plaintiff had had contacts with homosexual groups since entering the Navy.
 
 
 15
 This information was forwarded to the Naval Investigative Service. Plaintiff provided investigators a sworn statement which recited in pertinent part:
 
 
 16
 Regarding my sexual activities I first engaged in sexual activity with males after my enlistment in the Navy. Since that time I have engaged in sex with males. I would not like to name any people that I have been engaged with. I have and do beliv (sic ) myself to be bisexual. I have been President of the Monterey Dons Motorcycle Club for 2 years. I have been in the Gilded Cage, Rightous (sic ) Ram, known to be gay bars.
 
 
 17
 An administrative discharge board was thereupon convened to consider plaintiff's possible administrative discharge by reason of unfitness. The board recommended an honorable discharge based upon unfitness. This recommendation was forwarded to the Chief of Naval Personnel, who ordered plaintiff discharged on December 18, 1975. Beller brought suit in the district court, seeking an injunction preventing the Navy from involuntarily discharging him, an injunction directing the Navy to expunge from service records and all other files maintained on Beller any reference to the administrative board or his separation from the Navy as a homosexual, declaratory relief to the effect that he is serving under a valid enlistment contract, and damages for violation of the Privacy Act. The district court granted a temporary restraining order preventing discharge, but eventually it denied plaintiff's motion for a preliminary injunction and entered judgment for the Navy. The Navy then separated Beller with an honorable discharge based upon unfitness. Since discharge, Beller has remained a civilian. He has not applied for reenlistment.
 
 II
 
 18
 The delays inherent in securing appellate review, and the shifting, at times seemingly inconsistent, position of the Navy with regard to several issues in this case, have combined to produce several difficult threshold issues. We address these issues in the context of Saal's case and then apply our analysis to Beller and Miller.
 
 Saal
 A. Subject Matter Jurisdiction
 1. The District Court's Opinion
 
 19
 In its motion for summary judgment, the Navy argued that the district court lacked jurisdiction because the amount in controversy did not exceed $10,000. In the alternative, the Navy contended that if the damages sought by Saal did exceed $10,000, the Court of Claims had exclusive jurisdiction. See 28 U.S.C. § 1491.
 
 
 20
 The district court held Saal had alleged with sufficient certainty that the amount in controversy exceeded $10,000. It also held that it had jurisdiction over all of her various claims for relief under 28 U.S.C. § 1331, since "plaintiff's claim arises under the Fifth Amendment of the Constitution." The court noted that Davis v. Passman, 544 F.2d 865 (5th Cir. 1977), and Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), supported a right of action for damages under the fifth amendment and were "authority for the existence of jurisdiction here." 427 F.Supp. at 196 n.2.[1] In granting partial summary judgment for Saal, however, the court addressed itself only to Saal's requests for declaratory and injunctive relief. See 427 F.Supp. at 203. It stated, "The present record does not permit disposition of (Saal's) claim for damages and other relief." Id. at 195.
 
 2. The Jurisdictional Amount Requirement
 
 21
 The congressional abolition of the jurisdictional amount requirement for suits brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity applies to this case.[2] Therefore, it is not essential to the district court's jurisdiction under 28 U.S.C. § 1331 that the amount in controversy exceed $10,000. Andrus v. Charlestone Stone Products Co., 436 U.S. 604, 607-08 n.6, 98 S.Ct. 2002, 2005-2006, 56 L.Ed.2d 570 (1978). See also National Treasury Employees Union v. Campbell, 589 F.2d 669, 677 & n.19 (D.C.Cir.1978), and cases cited therein. Although it is unnecessary for us to address the issue fully, mandamus jurisdiction might also be appropriate in these cases, see benShalom v. Secretary of the Army, 489 F.Supp. 964, 969-970 (E.D.Wis.1980), and cases cited therein.
 
 3. Sovereign Immunity
 
 22
 As the court said in Neal v. Secretary of the Navy, 472 F.Supp. 763, 770 (E.D.Pa.1979), "(t)he legal principles which define the contours of the doctrine of sovereign immunity are far from clear." In general, "(t)he United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). See also United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Unless sovereign immunity has been waived or does not apply, it bars equitable as well as legal remedies against the United States. Jaffee v. United States, 592 F.2d 712, 717 n.10 (3d Cir. 1979) citing (Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962)); Midwest Growers Co-op Corp. v. Kirkemo, 533 F.2d 455, 465 (9th Cir. 1976). See generally K. Davis, Administrative Law Treatise ch. 27 (1958 & Supp.1970); K. Davis, Administrative Law of the Seventies ch. 27 (1976 & Supp.1980); 1 Moore's Federal Practice P 0.65(2.-1 to 2.-3) (2d ed. 1979); C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3655 (1976).
 
 
 23
 Saal's suit is against defendant Middendorf in his official capacity.[3] We must first determine whether sovereign immunity bars Saal's claims for equitable relief.
 
 
 24
 In Glines v. Wade, 586 F.2d 675 (9th Cir. 1978), rev'd on other grounds sub nom. Brown v. Glines, 440 U.S. 957, 99 S.Ct. 1496, 59 L.Ed.2d 769 (1980), plaintiff Glines, a Captain in the Air Force Reserves on active duty, violated a regulation requiring him to obtain approval from his commander before circulating petitions on Air Force bases. As a result of his unauthorized activities, Glines was removed from active duty and reassigned to the standby reserves, with adverse financial consequences. This court concluded the regulations violated Glines' first amendment rights. It then held that "the district court was correct in declaring the regulations void, enjoining their enforcement, and ordering Glines reinstated in a status that is consistent with his status before he was relieved from active duty." 586 F.2d at 681. The court held that sovereign immunity did not bar the district court from awarding this nonmonetary relief:
 
 
 25
 (In) actions claiming that a government official acted in violation of the Constitution or of statutory authority ... Congress has either waived sovereign immunity or the doctrine does not apply. 5 U.S.C. § 702; Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689-91, 69 S.Ct. 1457, 1461-1462, 93 L.Ed.2d 1628 (1949); Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978); 14 Wright, Miller, and Cooper, Federal Practice and Procedure § 3655 (Supp.1977).
 
 
 26
 586 F.2d at 681.
 
 
 27
 The waiver of sovereign immunity found by the court was an amendment to the Administrative Procedure Act. The amendment provided in part:
 
 
 28
 An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.
 
 
 29
 5 U.S.C. § 702. In Hill v. United States, 571 F.2d 1098 (9th Cir. 1978), an action brought in the district court under the Tucker Act, 28 U.S.C. § 1346(a), this court held that the waiver of sovereign immunity expressed in section 702 applied retroactively to actions brought in the district court under 28 U.S.C. § 1346(a). We construe the decisions in Glines and Hill as holding that section 702 waives sovereign immunity for Saal's action brought under 28 U.S.C. § 1331 seeking nonmonetary relief for violation of her fifth amendment rights. We recognize the division of authority on the question whether and under what circumstances section 702 waives sovereign immunity in actions brought under 28 U.S.C. § 1331. Compare Jaffee v. United States, supra, and Neal, supra, (waiver) with Estate of Watson v. Blumenthal, 586 F.2d 925 (2d Cir.1978) and Sharrock v. Harris, 473 F.Supp. 1173 (S.D.N.Y.1979) (no waiver). See also National Treasury Employees Union, supra, 589 F.2d at 673 n.7 (waiver) (dicta). Although the Glines decision admittedly did not address the sovereign immunity issue in as much detail as the courts in Jaffee or Watson, we think it states the controlling law of this circuit. We therefore affirm the district court's determination that it had jurisdiction over Saal's claims for nonmonetary relief under 28 U.S.C. § 1331.
 
 
 30
 Our conclusion is consistent with Lee v. Blumenthal, 588 F.2d 1281 (9th Cir. 1979), where the plaintiff sought a writ of mandamus to compel the Secretary of the Treasury to redeem certain bonds controlled by the Second Liberty Bond Act. 31 U.S.C. §§ 752, 754(b). The court viewed the plaintiff's lawsuit as essentially one for money damages arising from a contract dispute and concluded that the Court of Claims had exclusive jurisdiction over the action since a judgment over $10,000 was sought. See also Watson, supra. The court's brief discussion of 5 U.S.C. § 702 and Hill, supra, is best understood as recognizing that section 702 was not intended to disturb the existing limitations on district court jurisdiction imposed by the Tucker Act. We do not interpret Lee to hold that section 702 was not a waiver of sovereign immunity in actions properly brought under section 1331.
 
 
 31
 In light of our holding, we find it unnecessary to address whether the language in Glines and Larson, stating that sovereign immunity does not apply where the plaintiff claims "that a government official acted in violation of the Constitution," 586 F.2d at 681, would provide an alternate ground, independent of 5 U.S.C. § 702, for finding sovereign immunity inapplicable to Saal's nonmonetary claims.[4] At least one commentator has viewed the decisions in this area as hopelessly inconsistent, see K. Davis, Administrative Law Treatise ch. 27 (1958 & Supp.1970); K. Davis Administrative Law of the Seventies ch. 27 (1976 & Supp.1980), and we decline to attempt a reconciliation here.
 
 
 32
 As we noted before, the district court granted summary judgment only on Saal's claims for nonmonetary relief. There may be several difficult issues with regard to whether sovereign immunity bars Saal's claims for monetary relief. Since that aspect of her case is not before us, however, we do not resolve them on this appeal.[5]
 
 Beller
 
 33
 Plaintiff Beller also sued Middendorf and his codefendants in their official capacities. Like Saal, Beller alleged that the amount in controversy exceeded $10,000 and that jurisdiction was proper under 28 U.S.C. § 1331. He also claimed the district court had mandamus jurisdiction, 28 U.S.C. § 1361. Beller requested damages only with regard to his action brought under the Privacy Act, 5 U.S.C. § 552a. The district court granted summary judgment to the Navy on this claim, and we affirm.[6]
 
 
 34
 Beller requested an injunction prohibiting the defendants from discharging him in violation of his statutory and constitutional rights and also an order directing defendants to expunge from his service records and all other files any reference to his administrative board proceedings or separation from the Navy as a homosexual. The congressional waiver of sovereign immunity in these circumstances, see pp. 795-796 supra, is sufficient to give the federal courts jurisdiction over Beller's claims for nonmonetary relief.
 
 
 35
 In the district court the Navy argued that the court had no jurisdiction because plaintiff's action was merely one for breach of his enlistment agreement, and jurisdiction lay exclusively in the Court of Claims since the claims exceeded $10,000. The court rejected this argument, holding that the "primary relief" sought by Beller was nonmonetary. We can assume arguendo that a district court does not lose jurisdiction over a claim for nonmonetary relief simply because it may later be the basis for a money judgment. See, e. g., Melvin v. Laird, 365 F.Supp. 511 (E.D.N.Y.1973). This does not necessarily mean that a district court has jurisdiction over a back pay claim in excess of $10,000 if the court finds the relief sought is "essentially" or "primarily" nonmonetary, and we doubt that cases such as Mathis v. Laird, 483 F.2d 943 (9th Cir. 1973), stand for such a principle. Cf. Glines, supra. Beller, however, did not seek back pay damages in excess of $10,000 for violation of his enlistment agreement. We think Glines v. Wade controls our disposition of this issue and requires a holding that the Court of Claims does not have exclusive jurisdiction over the nonmonetary claims of Beller, Saal, and Miller. The cases before us more closely resemble Glines than Denton v. Schlesinger, 605 F.2d 484 (9th Cir. 1979), where the plaintiffs sought $350,000 damages and full reinstatement because their termination from the military allegedly violated their contract, statutory, and constitutional rights. Beller did not seek damages, and the grounds which the court in Denton gave for finding Glines distinguishable, see id. at 486 n.4, apply equally to this case.
 
 Miller
 
 36
 Miller's action was also brought pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1361. In the proceedings below Miller did not seek damages or back pay (possibly because he has been retained in the Navy pursuant to this court's order), and his complaint did not request declaratory relief. Miller did, however, seek an injunction "restraining respondents from discharging petitioner from the United States Navy, or awarding him a less than Honorable Discharge." In light of what we have already said above and the possibility of awarding meaningful injunctive relief, which we discuss below, we conclude the district court had jurisdiction pursuant to section 1331 of Miller's action.
 
 B. Mootness
 
 37
 In all three appeals the Navy contends there is no case or controversy and that the suits should be dismissed as moot. Its argument is essentially this: (a) the enlistment terms of all three plaintiffs have expired; (b) neither Saal nor Beller has applied for reenlistment after being discharged; (c) even if they, like Miller, had applied for reenlistment, the district court cannot order the Navy to accept those reenlistment applications; (d) thus, even assuming the discharge proceedings were invalid for some reason, the district courts at this point are unable to provide a remedy and any adjudication regarding the Navy's reasons for refusing to permit Saal and Beller to reenlist would be premature; and (e) thus, there is no controversy capable of being decided by the courts. We disagree with the Navy. Although the facts in each of the appeals before us differ, with regard to mootness we conclude they are sufficiently similar so that separate consideration is unnecessary.
 
 
 38
 For purposes of determining whether this appeal is moot, we note that the plaintiffs probably have a damages claim under the Tucker Act for less than $10,000 which they could maintain in the district court, see VanderMolen v. Stetson, 571 F.2d 617 (D.C.Cir.1977), even if those claims were ultimately determined to be without merit. In light of our holding below that the Navy did not act unconstitutionally in discharging these plaintiffs, no point would be served by permitting plaintiffs to amend their complaints. In passing on mootness, however, we consider the case as if such claims had been pled in the district court. When so considered, this appeal is not moot. See Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 8-9, 98 S.Ct. 1554, 1559-1560, 56 L.Ed.2d 30 (1978); Bituminous Coal Operators' Ass'n v. U.M.W., 585 F.2d 586, 599 (3d Cir. 1978).
 
 
 39
 Even if the district courts have no jurisdiction over any damages actions by these plaintiffs, we still conclude that their requests for nonmonetary relief are not moot. As a result of regulations and procedures challenged as constitutionally infirm, the plaintiffs claim they were injured in various ways: for example, they were subject to stigma as being unfit for military service, allegedly without a hearing on this question; they were given a reenlistment code which prevented them from continuing employment in the military; and the discharge and accompanying materials in their personnel records may injure their employment prospects. These injuries, if proven, are of a continuing nature; they did not expire with plaintiffs' term of enlistment. In a somewhat analogous context, this circuit has held that the possibility of being recalled to active duty, even when there is no evidence of imminent recall, is sufficient to prevent an action challenging the military's refusal to discharge the plaintiff as a conscientious objector from being moot. Taylor v. Claytor, 601 F.2d 1102 (9th Cir. 1979); Bratcher v. McNamara, 448 F.2d 222 (9th Cir. 1971). The possible continuing injuries noted above are, we think, sufficient to justify our conclusion that a live case or controversy exists in all three appeals.[7] See also Brown v. Board of Bar Examiners, 623 F.2d 605, 607-608 (9th Cir. 1980) (appellate review of order requiring that applicant be permitted to take bar examination cannot practically be obtained before the exam; therefore, case not moot). Cf. Berg v. Claytor, 591 F.2d 849 (D.C.Cir.1978); Matlovitch v. Secretary of the Air Force, 591 F.2d 852 (D.C.Cir.1978) (jurisdiction asserted over claims similar to plaintiffs' here).
 
 
 40
 We reject the Navy's argument that no declaratory or injunctive relief capable of being granted by the courts would be responsive to the constitutional violations alleged by the plaintiffs. We are aware of the principle that the military cannot be forced to accept a reenlistment application, O'Callahan v. United States, 196 Ct.Cl. 556, 451 F.2d 1390 (1971). Even if correct, however, this doctrine does not foreclose various other kinds of injunctive or declaratory relief discussed above and by the district courts in these cases.
 
 C. Exhaustion of Administrative Remedies
 
 41
 The Navy maintains that Saal's and Beller's complaints should have been dismissed because they failed to exhaust administrative remedies. Saal and Beller, say the Navy, should have applied for reenlistment and upon rejection sought review before the Board for Correction of Naval Records (BCNR). See 10 U.S.C. § 1552; 32 C.F.R. § 723. The principal authority relied upon by the Navy is Champagne v. Schlesinger, 506 F.2d 979 (7th Cir. 1974), where the court required an enlisted person discharged under Instruction 1900.9A for homosexuality to seek review before the BCNR before challenging the constitutionality of his discharge in a district court. The court interpreted the relevant regulations to allow the BCNR to consider the validity of plaintiff's discharge and to recommend to the Secretary of the Navy appropriate relief, including reinstatement and back pay.
 
 
 42
 Our focus in this case is on the constitutionality of the Navy's actions in discharging the plaintiffs, not the constitutionality of Navy regulations prohibiting acceptance of enlistment applications from homosexuals. The Navy's arguments regarding the prematurity of the plaintiffs' challenges to those practices are therefore inapposite. Even if the Navy's reenlistment practices were before us, the record makes it plain that any reenlistment application by Saal and Beller would be completely futile.
 
 
 43
 There is some tension between the holding in Champagne and this circuit's decisions in Glines v. Wade, supra, and Downen v. Warner, 481 F.2d 642 (9th Cir. 1973), which hold exhaustion of BCNR remedies unnecessary before challenging regulations principally on constitutional grounds. Our own precedents control. In any event, our interpretation of the applicable Navy policies differs from that in Champagne. We understand Navy policy to require discharge of members who have engaged in homosexual conduct, subject only to a power of discretionary retention vested in the Secretary which is unrelated to the BCNR's function. In light of our understanding, it would serve no purpose for the plaintiffs to pursue such administrative remedies. Cf. Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (suggesting that administrative agency may not pass upon constitutional challenges to statutes).
 
 III
 
 44
 The due process questions presented by the actions of the Navy are both sensitive and complex. We must consider interrelated issues of procedural due process, substantive due process, and to a lesser extent what one commentator has labeled "structural due process," see Tribe, Structural Due Process, 10 Harv.C.R.-C.L.L.Rev. 269 (1975), and equal protection.[8]
 
 
 45
 A. The Navy's Policy Regarding Discharge of Homosexuals
 
 
 46
 To evaluate the constitutionality of the Navy's conduct, it is necessary to determine what the Navy's policy regarding discharge of homosexuals really is. The policy of the Secretary which was applied to the plaintiffs begins: "Members involved in homosexuality are military liabilities who cannot be tolerated in a military organization.... Their prompt separation is essential." Inst. 1900.9A. We conclude that this instruction and the applicable regulations make discharge of known homosexuals mandatory, subject only to a kind of executive discretion vested in the Secretary which is unrelated to the fitness of any particular individual.[9]
 
 
 47
 Since 1974, in Champagne v. Schlesinger, supra, the Navy in litigation has maintained that its regulations do not require discharge of all homosexuals. It claims that the regulations, which are quoted at length below, require that homosexuals only be processed for discharge; the discharge board can recommend retention, and the Secretary has discretion to retain a known homosexual where he considers it appropriate.
 
 
 48
 In Berg v. Claytor, supra, the Court of Appeals for the District of Columbia Circuit accepted the Navy's explanation of its policy but remanded the case to the Secretary for a fuller explanation of why the Secretary decided not to retain the plaintiff. Cf. Gayer v. Schlesinger, 490 F.2d 740 (D.C.Cir.1973) (interpreting security clearance regulations). With all respect, we cannot agree with that court's view of the applicable regulations.
 
 
 49
 The Secretary's policy regarding homosexuals states:
 
 
 50
 Members involved in homosexuality are military liabilities who cannot be tolerated in a military organization. In developing and documenting cases involving homosexual conduct, commanding officers should be keenly aware that members involved in homosexual acts are security and reliability risks who discredit themselves and the naval service by their homosexual conduct. Their prompt separation is essential.
 
 
 51
 SECNAVINST 1900.9A. The Navy's Personnel Manual prescribes several grounds on which enlisted persons "may be separated by reason of misconduct." BUPERSMAN § 3420185. Homosexual acts, various sexual offenses, and sale or trafficking in drugs are the only categories where the regulations provide, "Processing for discharge is mandatory." The regulations governing other grounds for discharge by reason of misconduct permit various ways for a member to rehabilitate himself or to demonstrate that because of other reasons he should be retained.[10] The regulations also provide that members may be discharged by reason of unfitness on similar grounds, and the plaintiffs here were discharged under the unfitness regulations. Homosexual acts (and conduct labelled "sexual perversion") are singled out with the directive, "Processing for discharge is mandatory," while some form of individual consideration or rehabilitation is provided for in connection with other grounds.[11] The category for homosexual acts explicitly refers to INST. 1900.9 as an expression of the controlling policy.
 
 
 52
 The district courts in Saal and Martinez v. Brown, 449 F.Supp. 207 (N.D.Cal.1978), concluded the regulations required discharge of a person found to be homosexual. Both courts noted that the Navy was given the opportunity to demonstrate that it retains some known homosexuals and to articulate the factors which influence the Secretary's decision in such cases. The Secretary in these cases was either unable or unwilling to do so.[12] Other indications in the records of the cases before us support the conclusion that "as applied, the regulations require the mandatory discharge of those found to be homosexuals or to have engaged in homosexual conduct." Martinez, supra, 449 F.Supp. at 212.[13]
 
 
 53
 We can agree with the Navy that one kind of discretion is permitted by the regulations. The Secretary urges that he has broad discretion to retain a homosexual if the individual is of extraordinary value to the Navy. One explanation proffered by the Secretary in Beller suggests that the fitness of the individual to serve and the likelihood that retaining the individual will impair the efficiency of the service are considered by the Secretary. In his brief, the Secretary states:
 
 
 54
 (T)he decision of whether or not to discharge or retain a serviceman involves a high degree of military discretion and judgment. The decision is based on a balance that only the military can strike, and the individuality of each decision makes guidelines impossible. What must be weighed is the need of the service for the specific attributes and talents that the particular serviceman possesses and the effect on the military of the loss of the services of that individual, against the actual or probable detriment that retention of the individual would have upon the military in general, and the effectiveness of the individual in particular.
 
 
 55
 As developed further in this and other cases, however, see, e. g., Berg, supra, 436 F.Supp. at 81, 591 F.2d at 850-51; Matlovich, supra, 591 F.2d at 856-61, an individual with an otherwise fine service record will not be retained unless the Secretary concludes his record marks him as being highly unusual or especially valuable to the Navy. This kind of consideration does not contemplate evaluating the fitness of an individual to continue military service.
 
 
 56
 For our purposes, therefore, the applicable Navy practices may be summarized as follows: the Secretary will discharge a person found by a discharge board to have engaged in homosexual acts covered by the regulations. The Secretary has discretion to retain a person in rare instances, but these instances are unrelated to the fitness to serve of the particular individual or the reasons why the Navy in general discharges homosexuals.[14]
 
 B. Procedural Due Process
 
 57
 In determining whether the procedures followed by the Navy in processing the plaintiffs for discharge violated the requirements of procedural due process, the threshold inquiry is whether the plaintiffs were deprived of an interest in property or liberty. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
 
 1. Property Interest
 
 58
 The discharge proceedings and ultimate separations did not deprive plaintiffs of a property interest without due process. The district court in Berg stated the reason succinctly:
 
 
 59
 (U)nder Navy policy there can be no doubt that committing homosexual acts while in the Navy is cause for termination. Plaintiff has admitted to having performed homosexual acts while in the Service. Having admitted there was cause for dismissal, plaintiff's expectation of continued employment has been extinguished. Thus he had no property interest ....
 
 
 60
 436 F.Supp. at 81. The Navy regulations and practices create no reasonable expectation of continued employment once a person is determined to fall within the categories described in the applicable regulations. See, e. g., Austin v. United States, 206 Ct.Cl. 719, 723, cert. denied, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 274 (1975); Neal v. Secretary of the Navy, supra, 472 F.Supp. at 781-85; Knehans v. Alexander, 566 F.2d 312, 314 (D.C.Cir.1977), cert. denied, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 83 (1978). Cf. Tennessee v. Dunlap, 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976). Therefore, unless the Navy as a substantive matter may not discharge all homosexuals, or unless it must consider factors in addition to homosexuality in its decision, questions we discuss below, we see no basis for inferring any expectation of continued service sufficient to constitute a constitutional property interest. See generally Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). See also benShalom v. Secretary of the Army, supra, at 971. Cf. Wehner v. Levi, 562 F.2d 1276 (D.C.Cir.1977).[15]
 
 2. Liberty Interest
 
 61
 More difficult is the question whether the Navy's conduct deprived the plaintiffs of a protected liberty interest. The principles governing our analysis are contained in several leading cases, and we will not repeat them again. See, e. g., Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Roth, supra ; Perry, supra. See also Graves v. Duganne, 581 F.2d 222 (9th Cir. 1978); Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361 (9th Cir. 1976).
 
 
 62
 If the Navy's charges of homosexuality were false, made public, and followed by discharge, we can assume a deprivation of liberty would occur. In such a case the Navy's action "might seriously damage (the person's) standing and associations in his community" and would impose "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707.
 
 
 63
 In the cases before us, however, the plaintiffs either admitted or were found in a predischarge hearing to have engaged in the acts which allegedly imposed a stigma on them. The plaintiffs were allowed to introduce evidence to support their arguments that the Secretary should exercise his discretion to retain them. Under the applicable regulations, there was nothing more about which to have a hearing. Still putting aside the substantive questions whether the Navy may discharge all homosexuals or whether it must consider additional circumstances particular to the individual case, the reasoning of Codd v. Velger compels a conclusion that the plaintiffs' liberty interests were protected by the hearings they received. See also Graves v. Duganne, supra, 581 F.2d at 224.
 
 
 64
 Plaintiffs contend also they received the stigma of "unfitness" for retention, and that they never received a hearing on the issue. In the context of these cases, we reject this argument. The mere fact of discharge from a government position does not deprive a person of a liberty interest. See, e. g., Roth, supra, 408 U.S. at 574 n.13, 92 S.Ct. at 2707; Ventetuolo v. Burke, 596 F.2d 476, 483 (1st Cir. 1979); Knehans v. Alexander, supra, 566 F.2d at 314; Mazaleski v. Treusdell, 562 F.2d 701, 712-14 (D.C.Cir.1977); Stretten, supra, 537 F.2d at 366; Lieberman v. Gant, 474 F.Supp. 848, 858 (D.Conn.1979). The real stigma imposed by the Navy's action, moreover, is the charge of homosexuality, not the fact of discharge or some implied statement that the individual is not sufficiently needed to be retained. Cf. Tribe, supra, 10 Harv.C.R.-C.L.L.Rev. at 282-83 n.42. This is especially true since the regulations do not make fitness of the particular individual a factor in the decision to discharge.
 
 
 65
 The plaintiffs' admission of homosexual acts, and the fact that hearings on the subject were allowed, serve to dispose of the procedural due process claims. We note in addition that the deprivation of liberty claims based on the fact that the reasons for discharge will become public seems to us without merit in any event. Albeit in apparent response to the initiation of litigation, plaintiffs were given an honorable discharge. The Navy contends that nowhere on the separation papers given to the plaintiffs is there any indication of the reasons for the honorable discharge. Assuming arguendo that a discharge under less than honorable conditions imposes a stigma, see Lunding, Judicial Review of Military Administrative Discharges, 83 Yale L.J. 33, 33-41 (1973), the fact of an honorable discharge on its face seems to impose no stigma on the recipient. Plaintiffs contend the permanent records on file with the Navy contain the reenlistment code RE-4 and the reasons for their discharge. This information, contend plaintiffs, forecloses them from obtaining jobs with any other government agencies. The district court in Berg found, "There is no code or symbol connected with any papers or explanations available to prospective employees (sic ) or the public that identify the reasons underlying the honorable discharge." 436 F.Supp. at 80 n.2. The court in Saal disagreed, reasoning that the reasons for Saal's discharge and her reenlistment code were "necessarily reflected in her service record," and that the Navy had "compelled disclosure of her otherwise private sexual activity." 427 F.Supp. at 198. We have been directed to no evidence indicating that the plaintiffs' service records are likely to impose stigma upon them or make it more difficult for them to seek post-discharge employment. According to the Navy, the documents likely to be examined by future employers would contain no reason for the honorable discharge. On this record, we cannot conclude that the Navy's action has deprived the plaintiffs of a liberty interest.[16] See Bishop v. Wood, supra. See also Knehans, supra, 566 F.2d at 314; Lyons v. Sullivan, 602 F.2d 7, 11 n.6 (1st Cir.), cert. denied, 444 U.S. 876, 100 S.Ct. 159, 62 L.Ed.2d 104 (1979); benShalom, supra, at 972; Ventetuolo v. Burke, 470 F.Supp. 887, 895-96 (D.R.I.1978), aff'd, 596 F.2d 476 (1st Cir. 1979).
 
 C. Substantive Due Process
 
 66
 Plaintiffs' ultimate contention is that the Navy's regulations violate substantive guarantees inherent in the due process clause. We decide at the outset that this case does not require us to address the question whether consensual private homosexual conduct is a fundamental right, as that term is used in equal protection[17] and some due process cases.[18] If we were to answer in the affirmative, it would follow that the conduct in question is subject to prohibition only to further compelling state interests and that the category used or burden imposed by the regulation must be a necessary, or the least restrictive, way to promote those interests. To formulate the issue in those terms would reflect, we think, a misunderstanding of proper substantive due process analysis.
 
 
 67
 These appeals were not presented to us as implicating a suspect or quasi-suspect classification. The attacks, rather, were based on the claim that the conduct prohibited by the regulation was protected as an aspect of the fundamental right of privacy. Substantive due process, not equal protection, was the basis of the constitutional claim, and we address the case in those terms.
 
 
 68
 The rather formal three-tier analysis of the Court's recent equal protection decisions differs somewhat from its less categorical approach when questions of substantive due process are involved. Recent decisions indicate that substantive due process scrutiny of a government regulation involves a case-by-case balancing of the nature of the individual interest allegedly infringed, the importance of the government interests furthered, the degree of infringement, and the sensitivity of the government entity responsible for the regulation to more carefully tailored alternative means of achieving its goals. See Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); id. at 396, 98 S.Ct. at 686 (Stewart, J., concurring in the judgment) (citing Williams v. Illinois, 399 U.S. 235, 260, 90 S.Ct. 2018, 2031, 26 L.Ed.2d 586 (1970) (Harlan, J., concurring in the result)); Moore v. City of E. Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion).[19]
 
 
 69
 Although the Court's approaches to equal protection and due process cases differ, there are important analytic and rhetorical similarities in the doctrines. When conduct, either by virtue of its inadequate foundation in the continuing traditions of our society or for some other reason, such as lack of connection with interests recognized as private and protected, is subject to some government regulation, then analysis under the substantive due process clause proceeds in much the same way as analysis under the lowest tier of equal protection scrutiny. A rational relation to a legitimate government interest will normally suffice to uphold the regulation. At the other extreme, where the government seriously intrudes into matters which lie at the core of interests which deserve due process protection, then the compelling state interest test employed in equal protection cases may be used by the Court to describe the appropriate due process analysis. See, e. g., Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). See generally Developments in the Law-The Constitution and the Family, 93 Harv.L.Rev. 1156, 1166-82, 1193-97 (1980).[20]
 
 
 70
 The case before us lies somewhere between these two standards. We recognize, as we must, that there is substantial academic comment which argues that the choice to engage in homosexual action is a personal decision entitled, at least in some instances, to recognition as a fundamental right and to full protection as an aspect of the individual's right of privacy. See, e. g., L. Tribe, American Constitutional Law § 15-13 (1978 & Supp.1979) and authorities cited therein. See also Symposium: Sexual Preference and Gender Identity, 30 Hastings L.J. 799 (1979); Gerety, Redefining Privacy, 12 Harv.C.R.-C.L.L.Rev. 233, 280-81 (1977); Richards, Unnatural Acts and the Constitutional Right to Privacy: A Moral Theory, 45 Fordham L.Rev. 1281 (1977); Wilkinson & White, Constitutional Protection for Personal Lifestyle, 62 Cornell L.Rev. 563 (1977); Note, The Constitutionality of Laws Forbidding Private Homosexual Conduct, 72 Mich.L.Rev. 1613 (1974). See generally Comment, Out of the Closet, Out of a Job: Due Process in Teacher Disqualification, 6 Hastings Const.L.Q. 663 (1979); Von. Beigel, The Criminalization of Private Homosexual Acts: A Jurisprudential Case Study of a Decision by the Texas Bar Penal Code Revision Committee, 6 Human Rights 23 (1977); Siniscalco, Homosexual Discrimination in Employment, 16 Santa Clara L.Rev. 495 (1976); Comment, A Homosexual's Legal Dilemma, 27 Ark.L.Rev. 687 (1973).
 
 
 71
 There is substantial authority to the contrary, however. The Supreme Court has issued a summary affirmance of a lower court decision denying a challenge to a state criminal statute prohibiting sodomy as applied to private consensual homosexual conduct. Doe v. Commonwealth's Attorney, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), aff'g 403 F.Supp. 1199 (E.D.Va.1975) (three judge court). Some commentators, in an effort to limit the holding, have attempted alternate explanations, see, e. g., L. Tribe, supra § 15-13 at 943.[21] See also benShalom, supra, at 975-976; New York v. Onofre, summarized in App.Div., 424 N.Y.S.2d 566 (1980) (N.Y.Sup.Ct.). Most federal courts, on the other hand, have understood the holding to be that homosexual conduct does not enjoy special constitutional protection under the due process clause. See, e. g., DeSantis v. Pacific Tel. & Tel. Co., 608 F.2d 327 (9th Cir. 1979) (homosexuals cannot claim protection under 42 U.S.C. § 1985(3); homosexuals not members of suspect or quasi-suspect class); id. at 334 (Sneed, J., concurring and dissenting) (after Doe, consensual homosexual behavior not characterized as fundamental right); J. B. K., Inc. v. Caron, 600 F.2d 710 (8th Cir. 1979), cert. denied 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980) (anti-prostitution statute violates no fundamental rights); Gay Alliance of Students v. Matthews, 544 F.2d 162, 166 (4th Cir. 1976) (dicta) (university may regulate homosexual conduct of students, or homosexual conduct which substantially disrupts operation and discipline of school); Lovisi v. Slayton, 539 F.2d 349 (4th Cir.) (en banc), cert. denied, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976) ("(Doe ) necessarily confined the constitutionally protected right of privacy to heterosexual conduct ..."); Mississippi Gay Alliance v. Goudelock, 536 F.2d 1073 (5th Cir.), cert. denied, 430 U.S. 982, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1976) (dicta) (first amendment does not require newspaper to run advertisement arguably soliciting illegal homosexual conduct); In re Nemetz, 485 F.Supp. 470 (E.D.Va.1980) (consensual private homosexual relations may be basis for denying petition for naturalization because of lack of good moral character; Virginia's sodomy statute upheld in Doe ); Wilson v. Swing, 463 F.Supp. 555 (M.D.N.C.1978) (adulterous conduct not protected by either first amendment or due process clause). See also Paris Adult Theatre I v. Slaton, 413 U.S. 49, 65-68, 93 S.Ct. 2628, 2639-2641, 37 L.Ed.2d 446 (1973). Cf. Zablocki v. Redhail, supra, 434 U.S. at 396-403, 98 S.Ct. at 686-690 (Powell, J., concurring in the judgment). But see New York v. Onofre, supra (sodomy statute unconstitutional as applied to consenting homosexuals). Cf. Carey v. Population Services International, 431 U.S. 678, 688 n.5, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977) (plurality opinion) (whether and when constitution prohibits state regulation of private consensual sexual behavior among adults unsettled); benShalom, supra (homosexual tendencies or personality protected).
 
 
 72
 In light of the above authorities, we can concede arguendo that the reasons which led the Court to protect certain private decisions intimately linked with one's personality, see, e. g., Roe, supra, and family living arrangements beyond the core nuclear family, see, e. g., Zablocki, supra, suggest that some kinds of government regulation of private consensual homosexual behavior may face substantial constitutional challenge. See, e. g., Doe v. Commonwealth's Attorney, supra, 403 F.Supp. at 1203-05 (Merhige, J., dissenting). Such cases might require resolution of the question whether there is a right to engage in this conduct in at least some circumstances. The instant cases, however, are not ones in which the state seeks to use its criminal processes to coerce persons to comply with a moral precept even if they are consenting adults acting in private without injury to each other. Instead, these appeals require an assessment of a military regulation which prohibits personnel from engaging in homosexual conduct while they are in the service. We conclude, in these cases, that the importance of the government interests furthered, and to some extent the relative impracticality at this time of achieving the Government's goals by regulations which turn more precisely on the facts of an individual case, outweigh whatever heightened solicitude is appropriate for consensual private homosexual conduct.
 
 
 73
 The nature of the employer-the Navy-is crucial to our decision. While it is clear that one does not surrender his or her constitutional rights upon entering the military, the Supreme Court has repeatedly held that constitutional rights must be viewed in light of the special circumstances and needs of the armed forces. As the Court said in Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), the military is "by necessity, a specialized society separate from civilian society." Military services "must insist upon a respect for duty and a discipline without counterpart in civilian life." Schlesinger v. Councilman, 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975); Department of the Air Force v. Rose, 425 U.S. 352, 367-68, 96 S.Ct. 1592, 1602, 48 L.Ed.2d 11 (1976). Regulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities. See, e. g., Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). See also Sherwood v. Brown, 619 F.2d 47 (9th Cir. 1980). Thus, for example, a quasi-military entity such as a police department may constitutionally limit the hair length of its officers. Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976).
 
 
 74
 There are multiple grounds for the Navy to deem this regulation appropriate for the full and efficient accomplishment of its mission. The Navy can act to protect the fabric of military life, to preserve the integrity of the recruiting process, to maintain the discipline of personnel in active service, and to insure the acceptance of men and women in the military, who are sometimes stationed in foreign countries with cultures different from our own. The Navy, moreover, could conclude rationally that toleration of homosexual conduct, as expressed in a less broad prohibition, might be understood as tacit approval.
 
 
 75
 An affidavit from the Assistant Chief of Naval Personnel, quoted in the accompanying footnote, outlines the Navy's reasons for its policy.[22] The Navy "perceive(s) that homosexuality adversely impacts on the effective and efficient performance of the mission of the United States Navy in several particulars." The Navy is concerned about tensions between known homosexuals and other members who "despise/detest homosexuality"; undue influence in various contexts caused by an emotional relationship between two members; doubts concerning a homosexual officer's ability to command the respect and trust of the personnel he or she commands; and possible adverse impact on recruiting. These concerns are especially serious, says the Navy, where enlisted personnel must on occasion be in confined situations for long periods.
 
 
 76
 We agree with the district courts in Saal and Berg that "the concerns have a basis in fact and are not conjectural." Berg, supra, 436 F.Supp. at 80. Despite the evidence that attitudes towards homosexual conduct have changed among some groups in society, the Navy could conclude that a substantial number of naval personnel have feelings regarding homosexuality, based upon moral precepts recognized by many in our society as legitimate, which would create tensions and hostilities, and that these feelings might undermine the ability of a homosexual to command the respect necessary to perform supervisory duties. During the discharge hearings of the plaintiffs, various members who testified on their behalf indicated that while the plaintiffs' homosexuality did not impair the efficiency of the Navy, a member's homosexual conduct might in other circumstances cause difficulties, especially aboard a ship. Similarly, the other concerns expressed by the Navy might not apply in any particular case, but do have some basis in fact. These considerations are adequate to sustain the regulation in its military context.
 
 
 77
 The Navy's blanket rule requiring discharge of all who have engaged in homosexual conduct is perhaps broader than necessary to accomplish some of its goals, as the somewhat narrower regulation now in effect suggests. In view of the importance of the military's role, the special need for discipline and order in the service, the potential for difficulties arising out of possible close confinement aboard ships or bases for long periods of time, and the possible benefit to recruiting efforts, however, we conclude that at the present time the regulation represents a reasonable effort to accommodate the needs of the Government with the interests of the individual.
 
 
 78
 Upholding the challenged regulations as constitutional is distinct from a statement that they are wise. The latter judgment is neither implicit in our decision nor within our province to make. We note that the Navy's current regulations permit at least some flexibility in dealing with discharge of homosexuals, while the regulations before us do not. We are mindful that the rule discharging these plaintiffs is a harsh one in their individual cases, but we cannot under the guise of due process give our opinion on the fairness of every application of the military regulation. It should be plain from our opinion that the constitutionality of the regulations stems from the needs of the military, the Navy in particular, and from the unique accommodation between military demands and what might be constitutionally protected activity in some other contexts.
 
 
 79
 We reject the other arguments of the plaintiffs in these cases as without merit. The judgments in Beller and Miller are affirmed. The judgment of the court in Saal is reversed.
 
 
 
 *
 Honorable A. Sherman Christensen, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 The panel opinion in Davis was subsequently reversed, Davis v. Passman, 571 F.2d 793 (5th Cir. 1978) (en banc). That opinion was reversed by the Supreme Court, which implied a cause of action for damages under the fifth amendment. Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)
 
 
 [2]
 We hold below that the defendant Middendorf is being sued in his official capacity, see pp. 796-797 infra
 
 
 [3]
 Saal sued the Secretary of the Navy, first John Chaffee and then Middendorf, in his official capacity and sought equitable relief from the Secretary in his official capacity. She sought, inter alia,
 a permanent injunction, enjoining defendant and his agents from depriving plaintiff of the opportunity to apply for reenlistment despite the fact of her homosexual conduct, requiring that defendant and his agents review said application and act upon it on the merits of plaintiff's service performance record, and requiring that all records concerning the homosexuality-based discharge proceedings against plaintiff either be destroyed or permanently sealed and prevented from being distributed to any person.
 
 
 [4]
 In Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), the Court examined the doctrine of sovereign immunity when equitable relief is requested. Sovereign immunity concerns are implicated by injunctions directed against federal officers, said the Court, since "(i)n each such case the question is directly posed as to whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign." 337 U.S. at 688, 69 S.Ct. at 1460. In the context of actions seeking nonmonetary relief, the Court indicated that sovereign immunity did not apply where the officer acted unconstitutionally. 337 U.S. at 690-91, 69 S.Ct. at 1461-1462
 The Court also stated that even where an officer acts unconstitutionally, sovereign immunity applies "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." Id. at 691 n.11, 69 S.Ct. at 1462. The distinction between injunctions which merely order cessation of conduct and those which require affirmative action of the sovereign or disposition of sovereign property, however, has not always been applied when injunctive or declaratory relief has been sought. See, e. g., Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). See also De Lao v. Califano, 560 F.2d 1384, 1391 (9th Cir. 1977); Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969) (interpreting Larson and footnote 11). As we conclude in the text, our holding regarding 5 U.S.C. § 702 makes resolution of the many issues created by Larson and its progeny unnecessary.
 
 
 [5]
 Bivens and its progeny, see, e. g., Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), which hold implicitly that sovereign immunity does not bar damages actions against federal officials in their individual capacity for violation of a person's constitutional rights, do not overcome the sovereign immunity barriers to plaintiffs' damages claims. The Bivens line of cases holds only that sovereign immunity is inapplicable when either damages or equitable relief, see Davis, supra, 442 U.S. at 246 n.24, 99 S.Ct. at 2277; Midwest Growers Co-Op Corp. v. Kirkemo, 533 F.2d 455, 465-66 (9th Cir. 1976) (equitable relief against individual federal officials), will be had from the federal official personally; they do not hold that sovereign immunity is waived in cases where relief will come from the sovereign. See Davis v. Passman, 544 F.2d 865, 877 (5th Cir. 1977), aff'd in part, vacated in part, 571 F.2d 793 (5th Cir. 1978) (en banc), rev'd and remanded on other grounds, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); American Ass'n of Commodity Traders v. Department of the Treasury, 598 F.2d 1233 (1st Cir. 1979). Cf. Butz v. Economou, 438 U.S. 478, 505, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978); Duarte v. United States, 532 F.2d 850, 851 (2d Cir. 1976); States Marine Lines, Inc. v. Shultz, 498 F.2d 1146, 1155-56 (4th Cir. 1974); Dean v. Gladney, 451 F.Supp. 1313, 1320 (S.D.Tex.1978)
 The district court in Neal v. Secretary of the Navy, 472 F.Supp. 763 (E.D.Pa.1979), in an action brought under 28 U.S.C. § 1331 seeking back pay and injunctive relief for violation of the plaintiff's fifth amendment due process rights, held that sovereign immunity did not bar the plaintiff's damages claim. Cf. Dry Creek Lodge, Inc. v. United States, 515 F.2d 926, 930-32 (10th Cir. 1975). The district court's interpretation of Dugan v. Rank, 372 U.S. 609, 621-22, 83 S.Ct. 999, 1006-1007, 10 L.Ed.2d 15 (1963), and Larson, supra, appears somewhat dubious, as these cases hold no more than an officer's unconstitutional acts can be made the basis for suits seeking equitable relief against the officers, see Dugan, supra, 372 U.S. at 622, 83 S.Ct. at 1007; Larson, supra, 337 U.S. at 686-91, 69 S.Ct. at 1459-1462.
 We recognize that this circuit has apparently not construed Larson and Dugan to bar all actions in which recovery will come from the public treasury. See, e. g., De Lao v. Califano, supra, 560 F.2d at 1391; Washington v. Udall, supra. On the other hand, some decisions have held sovereign immunity a bar to actions seeking money damages in contexts where equitable relief might have been permitted. See, e. g., Denton v. Schlesinger, 605 F.2d 484 (9th Cir. 1979); Glines v. Wade, 586 F.2d 675 (9th Cir. 1978), rev'd on other grounds sub nom. Brown v. Glines, 440 U.S. 957, 99 S.Ct. 1496, 59 L.Ed.2d 769 (1980); Jaffee v. United States, 592 F.2d 712, 717 (3d Cir. 1979). See also Hoopa Valley Tribe v. United States, 596 F.2d 435, 436-37 (Ct.Cl.1979). Since the posture of this case does not require us to resolve these issues definitively, we simply reaffirm that sovereign immunity principles apply in an action against a federal official in his official capacity brought under 28 U.S.C. § 1331 seeking monetary relief such as back pay or damages for lost promotional opportunities when the damages will be paid from government funds rather than the officer's personal funds. See Penn v. Schlesinger, 490 F.2d 700, 704-05 (5th Cir. 1973), rev'd on other grounds, 497 F.2d 970 (5th Cir. 1974) (en banc), cert. denied, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). Cf. Marcus Garvey Square v. Winston Burnett Construction Co., 595 F.2d 1126 (9th Cir. 1979) (interpreting "sue or be sued" provision of 12 U.S.C. § 1702).
 
 
 [6]
 The Privacy Act provides in part that no agency shall disclose a record without prior written consent of the individual to whom it pertains unless disclosure is "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Disclosure by the NIS to Captain Ward, as Commanding Officer of the installation, was entirely proper. The commanding officer is responsible for the "safety, well-being and efficiency of his entire command." 32 C.F.R. § 700.702(a). See Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). See also 32 C.F.R. § 701.107(b)(1) (implementing regulations). Captain Ward had a need for information disclosing a ground for discharging someone under his command
 Neither was there a violation of 5 U.S.C. § 552a(e)(3), which requires the agency to inform the individual asked to provide information of the principal purposes for which the information is intended to be used and the routine uses which may be made of the information. When Beller volunteered the information regarding his sexual practices he was being questioned in detail by the Naval Investigative Service, albeit originally in connection with a check for a top secret security clearance. Beller must have known that information which disclosed grounds for being discharged could be used in discharge proceedings.
 
 
 [7]
 We have some doubt whether these appeals are all within the capable of repetition yet evading review doctrine, see Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). The doctrine might be inapplicable if we were to view strictly the requirement that "there (be) a reasonable expectation that the same complaining party would be subjected to the same action again," 423 U.S. at 149, 96 S.Ct. at 348. We note that Miller has twice attempted to reenlist and Saal applied for an extension of her enlistment, but, strictly viewed, the action in question here pertains to discharge, not enlistment. On the other hand, as the Court recently said:
 Although later developments may have "reduce(d) the practical importance of this case" for the parties, it cannot be said that "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (Quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 364 (1968)).
 St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 537-38, 98 S.Ct. 2923, 2927-2928, 57 L.Ed.2d 932 (1978). The Court's conclusion that "(w)e cannot assume that petitioners will not re-enter the market in some fashion," id. at 538, 98 S.Ct. at 2928, although reached in a different factual context, also applies in these appeals. See also Brown v. Board of Bar Examiners, 623 F.2d 605, 607-608 (9th Cir. 1980) (requirement of reasonable expectation that same complaining party be subject to same action in future not strictly applied).
 
 
 [8]
 The due process clause of the fifth amendment includes equal protection components, and fifth amendment equal protection claims are treated the same as fourteenth amendment equal protection claims. See Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975); Schlesinger v. Ballard, 419 U.S. 498, 500 n.3, 95 S.Ct. 572, 573, 42 L.Ed.2d 610 (1975); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)
 
 
 [9]
 Since these lawsuits were initiated, the Navy has issued a new set of instructions and regulations governing the discharge of homosexuals. These regulations provide for limited retention of homosexuals. They state in part:
 A homosexual act is bodily contact with a person of the same sex with the intent of obtaining or giving sexual gratification.
 Any member who solicits, attempts, or engages in homosexual acts shall normally be separated from the naval service. The presence of such a member in a military environment seriously impairs combat readiness, efficiency, security and morale.
 A member who has solicited, attempted, or engaged in a homosexual act on a single occasion and who does not profess or demonstrate proclivity to repeat such an act may be considered for retention in the light of all relevant circumstances. Retention is to be permitted only if the aforesaid conduct is not likely to present any adverse impact either upon the member's continued performance of military duties or upon the readiness, efficiency, or morale of the unit to which the member is assigned either at the time of the conduct or at the time of processing according to the alternatives set forth herein.
 SECNAV Instruction 1900.9C. The Navy has taken the position in writing that these regulations do not apply retroactively to the plaintiffs in this case.
 The issuance of SECNAVINST 1900.9C raises the general principle of appellate procedure by which a reviewing court will apply to a case a new rule that has intervened between its pending decision and the original controversy. Fusari v. Steinberg, 419 U.S. 379, 387-89, 95 S.Ct. 533, 538-539, 42 L.Ed.2d 521 (1975); Bradley v. School Board, 416 U.S. 696, 710-21, 94 S.Ct. 2006, 2015-2021, 40 L.Ed.2d 476 (1974); Richardson v. Wright, 405 U.S. 208, 92 S.Ct. 788, 31 L.Ed.2d 151 (1972); Thorpe v. Housing Authority, 393 U.S. 268, 281-83, 89 S.Ct. 518, 525-526, 21 L.Ed.2d 474 (1969). This rule may be meaningfully applied, however, only to situations in which the new rule might yield a different result; the case of none of the individuals here presents this possibility. Both Beller and Saal have admitted to homosexual acts with various persons. Brief for Appellee (Saal) at 3; Appellant's (Beller's) Opening Brief at 3. The threshold criteria for discretionary retention under the new regulation are "a homosexual act" "on a single occasion"; the two criteria are conjunctive. The case of Miller is closer but no less clear. He has at various times denied being homosexual and expressed regret or repugnance at his acts. Nevertheless, no part of the record in his case, either alone or in combination with any other part, suggests the possibility of our remanding his case for consideration under SECNAVINST 1900.9C. Miller does not himself appear to have suggested that he met the criteria of 1900.9C. If we were to ignore all but the record evidence most favorable to Miller, application of 1900.9C to Miller would still be prevented by his admission at his hearing to at least two homosexual acts on two separate occasions:
 I had had an experience once before ... then these two boys came along and we just had the experiences.
 Record at 38. See Appellant's (Miller's) Opening Brief at 3.
 The clarity of the record on this point obviates the need for us to consider how Thorpe and similar cases might apply to Miller, which would involve, for example, the question of determining whether SECNAVINST 1900.9C might be applied retroactively to anyone. See Bradley, supra, (discussing factors governing retroactivity). Compare letter from H. Leathers, Dept. of Justice, to R. Fox, attorney for D. Beller (May 18, 1978) and letter from R. Adm. C. McDowell, Dep. Judge Advocate General, to H. Leathers, Dept. of Justice (Apr. 28, 1978), reprinted in App. A. to Appellant's (Beller's) Response to the Appellees' Suggestion that the Appeal Should be Dismissed as Moot (1900.9C not retroactive) with Declaration of R. J. Woolsey, Acting Sec. of the Navy, (Sept. 14, 1979) in Berg v. Claytor, Civ. No. 76-944 (D.D.C.) (finding 1900.9C inapplicable to Berg for failure to satisfy criteria, not discussing whether inapplicable for additional reason of nonretroactivity).
 
 
 [10]
 For example, discharge by reason of misconduct is permitted for
 Frequent involvement of a discreditable nature with civil and/or military authorities; an established pattern for shirking; an established pattern showing dishonorable failure to pay just debts, and/or dishonorable failure to contribute support to dependents, provided the member has been given a reasonable opportunity to overcome his/her deficiencies subsequent to official notification ... (T)he member shall be notified of his/her deficiencies and shall be counseled in regard thereto. (emphasis added)
 BUPERSMAN 3420185(1)(a). Similarly, with regard to discharge by reason of drug abuse not involving sale or trafficking, "(c)onsideration for either discharge or retention will be predicated upon an evaluation of the member in the context of the whole man concept, i. e., the member's admitted or proven drug abuse will be considered as only one factor in determining ultimate disposition." Id. at (1)(c).
 
 
 [11]
 See BUPERSMAN 3420220. That section provides in part:
 Members may be recommended for discharge by reason of unfitness for:
 a. Frequent involvement of a discreditable nature with civil or military authorities.
 b. An established pattern for shirking.
 c. An established pattern showing dishonorable failure to pay just debts.
 d. An established pattern showing dishonorable failure to contribute adequate support to dependents or failure to comply with orders, decrees, or judgments of a civil court concerning support of dependents.
 e. Homosexual acts. Processing for discharge is mandatory. (See SECNAVINST 1900.9 series for controlling policy and additional action required in cases involving homosexuality.)
 f. Sexual perversion, other than above, including but not limited to lewd and lascivious acts, sodomy, indecent exposure, indecent acts with or assault upon a child, or other indecent acts or offenses. Processing for discharge is mandatory.
 g. Drug abuse, the illegal, wrongful or improper use, possession, sale, transfer, or introduction on a military installation of any narcotic substance, marijuana, or dangerous drug, when supported by evidence not attributed to a urinalysis administered for identification of drug users and not attributable to the member's volunteering for treatment under the exemption program. Discharge of a member for drug abuse shall not be effected until the member has completed a 30-day period of counselling commencing when the member reports his drug abuse or when the member is formally warned by civil or military authorities that he is suspected of drug abuse. Except for drug exemption cases, drug abuse cases normally shall be investigated by the Naval Investigative Service as required in SECNAVINST 6710.1 series. Consideration for either discharge or retention will be predicated upon an evaluation of the member in the context of the whole man concept, i. e., the member's admitted or proven drug abuse will be considered as only one factor in determining ultimate disposition.
 h. Unsanitary habits.
 4b. Processing for discharge by reason of frequent involvement of a discreditable nature with civil or military authorities, an established pattern for shirking, an established pattern showing dishonorable failure to pay just debts, and/or dishonorable failure to contribute support to dependents, shall not be initiated until the member has been given a reasonable opportunity to overcome his deficiencies. When it is determined that a member may come within the purview of these specific categories, the member shall be notified of his deficiencies and shall be counseled in regard thereto. If no improvement is forthcoming within a reasonable time, the member shall be processed in accordance with the provisions of this article.
 
 
 [12]
 See Martinez v. Brown, 449 F.Supp. 207, 211 (N.D.Cal.1978); Saal v. Middendorf, 427 F.Supp. 192, 197 (N.D.Cal.1977)
 
 
 [13]
 As the court in Saal noted, 427 F.Supp. at 197 n.3, comments of the discharge board during Saal's hearing suggest the board considered the crucial issue to be whether Saal had engaged in homosexual acts and that fitness evidence was not relevant. The discharge board also seemingly was instructed by the Navy counsel that it had no discretion to retain Saal if it found she had engaged in homosexual acts
 In response to an interrogatory from Miller, the Navy had an opportunity in the district court to demonstrate that in the past it exercised discretion to retain enlisted persons found to be homosexuals. The Navy instead claimed that Miller's question was ambiguous, and summary judgment was entered before the Navy responded to Miller's more precisely worded question:
 Interrogatory No. 30: If, as the Navy and the Secretary of Defense represented to the United States Court of Appeals for the Seventh Circuit in Champagne, supra, the discharge or separation from the Navy is not mandatory, how many exceptions have been made over the past five years? In other words, how many members of the Navy, identified as "homosexuals" have been retained in the Navy?
 Answer No. 30: The use of the term "identified" makes this question impossible to answer. The term is imprecise. More information is needed.
 Captain C. R. Ward, the commanding officer who convened the discharge board in Beller, responded in the following way to plaintiff's interrogatories:
 Interrogatory No. 25 : The basis for the purported discharge of the plaintiff is for "unfitness." In what way is the plaintiff "unfit"?
 Answer No. 25 : He is an admitted homosexual.
 Interrogatory No. 26 : Are all "homosexuals" "unfit" for duty in the Navy?
 Answer No. 26 : Yes.
 
 
 [14]
 We note some slight confusion among the discharge boards regarding their discretion to recommend that an admitted homosexual be retained. The board in Miller's case recommended retention 2-1, and the discharge board in Berg was instructed that it had discretion to recommend retention, 591 F.2d at 851. The board in Saal's case was apparently told it had no discretion to recommend retention based on fitness, and the convening authority in Beller's case thought all homosexuals unfit. These discrepancies are of no constitutional significance. Any errors made in instructing the boards would operate to the benefit of the plaintiffs. The boards did permit introduction of evidence relevant to whether the individual should be retained. Finally, the ultimate decision to retain rests with the Secretary. See Berg, supra, 436 F.Supp. at 81
 
 
 [15]
 We think our conclusion is consistent with the analysis of the district court in Saal, 427 F.Supp. at 199 n.6
 
 
 [16]
 That the facts are disclosed publicly in the course of this litigation does not affect our conclusion. A discharge under less than honorable conditions before expiration of a person's current term of enlistment, such as that originally awarded by the Navy to these plaintiffs, might present different considerations. We acknowledge some uncertainty regarding the public disclosure of the allegedly stigmatizing information. Were this issue crucial to our disposition, we might remand for a factual determination by the district court
 
 
 [17]
 See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)
 
 
 [18]
 See, e. g., Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973)
 
 
 [19]
 The kind of all-or-nothing substantive due process approach exemplified by the district court in Berg, supra, which asks simply whether homosexual conduct is protected as a fundamental right, does not, we think, reflect the complexity of the Court's analysis
 
 
 [20]
 The district courts, the Government, and the plaintiffs advance other due process and equal protection theories which require brief discussion. The due process clause does not require the Government to show with particularity that the reasons for the general policy of discharging homosexuals from the Navy exist in a particular case before discharge is permitted. In requiring the Government to act rationally as an employer, some courts have required the Government to demonstrate in discharge proceedings not only that the plaintiff falls within the general category which the applicable regulations list as grounds for discharge, but also that the particular plaintiff is unfit or unsuitable for continued employment. See, e. g., cases cited in Tribe, supra, § 15-13, at 941-42 n.3; Norton v. Macy, 417 F.2d 1161 (D.C.Cir.1969); benShalom, supra, at 976; Society for Individual Rights v. Hampton, 63 F.R.D. 399 (N.D.Cal.1973), aff'd on other grounds, 528 F.2d 905 (9th Cir. 1975); Martinez, supra; Saal, supra; Gay Law Students Ass'n v. Pacific Tel. & Tel. Co., 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979). See generally Tribe, Structural Due Process, supra ; Van Alstyne, Cracks in "The New Property": Adjudicative Due Process in the Administrative State, 62 Cornell L.Rev. 445 (1977). Such individual hearings might be appropriate on an equal protection theory when the grounds for discharge employ a classification subject to a heightened standard of scrutiny such as gender, see, e. g., Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Crawford v. Cushman, 531 F.2d 1114 (2d Cir. 1976), or when the regulations condition discharge on the exercise of protected activities, see, e. g., United States Dept. of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). Cf. benShalom, supra (Army regulations requiring discharge of persons expressing homosexual tendencies, as well as engaging in homosexual conduct, violate first amendment and due process clause; sexual personality and preference, as opposed to conduct, are protected by constitution right of privacy). See generally Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv.L.Rev. 1534 (1974). Compare, e. g., Upshaw v. McNamara, 435 F.2d 1188 (1st Cir. 1970) (upholding under rational basis test state regulation permitting exclusion of all felons pardoned on grounds other than innocence from city police department) with, e. g., Smith v. Fussenich, 440 F.Supp. 1077 (D.Conn.1977) (apparently faulty application of rational relation scrutiny). Under the analysis described in our opinion, individual treatment in some circumstances might be required by substantive due process, depending on the outcome of the balancing test. This case, however, involves neither middle-tier equal protection analysis nor a situation where the only alternative means available to satisfy the Government's goals consistent with due process is an individual showing of unfitness. Cf. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (rational relation test applied in equal protection challenge to mandatory retirement age for police force). While the substantive due process test we describe in the text does proceed on a case-by-case basis, it does not necessarily require the Government in each case involving changing norms to show that the reasons for the regulation apply in the particular case. Cf. Murgia, supra, 427 U.S. at 317-27, 96 S.Ct. at 2568-2573 (Marshall, J., dissenting) (equal protection analysis); Crawford v. Cushman, supra, 531 F.2d at 1125 (same); Tribe, Structural Due Process, supra
 As a purported application of so-called rational relation scrutiny, some of the above courts have, we think, misunderstood the meaning of rationality in the Court's due process cases. Nearly any statute which classifies people may be irrational as applied in particular cases. See Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Discharge of the particular plaintiffs before us would be rational, under minimal scrutiny, not because their particular cases present the dangers which justify Navy policy, but instead because the general policy of discharging all homosexuals is rational. See Berg, supra, 436 F.Supp. at 80.
 In Massachusetts Board of Retirement v. Murgia, supra, the Court held that strict scrutiny should not be applied to the classification of age, even though "the treatment of the aged in this nation has not been wholly free of discrimination." 427 U.S. at 313, 96 S.Ct. at 2566. The Court then concluded that the state's mandatory retirement policy rationally furthered legitimate goals. Id. at 315-16, 96 S.Ct. at 2567-2568. The case involved an equal protection challenge to the Government's action, and we find its result consistent with the court's later development of due process doctrine. Our conclusion is also consistent with Singer v. United States Civil Service Commission, 530 F.2d 247 (9th Cir. 1976), vacated in light of new position of the Government, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977), which held that the Civil Service may not summarily discharge a person without some showing that his or her homosexual conduct is in some way likely to impair the efficiency of the Civil Service. The case did not, however, hold that the Government must always conduct an individualized hearing on fitness before a homosexual may be discharged from any government employment.
 In addition to pursuing an analysis which we held above to be erroneous, the district court in Saal also appeared to declare due process violated because some other groups subject to discharge were not required to be discharged. See 427 F.Supp. at 201-02. Some personnel are given a second chance to "overcome his/her deficiencies subsequent to official notification," BUPERSMAN 3420185a. Those found to have engaged in drug abuse are to be evaluated "in the context of the whole man concept," and the fact of drug abuse "will be considered as only one factor in determining ultimate disposition." Id. at c. Giving someone a second chance to overcome his or her deficiencies is not at all the same as requiring fitness of the individual to be considered. In any event, the fact that the Navy's choice of categorization is overinclusive and underinclusive does not mean that the regulations violate due process, as we discuss in the text. The Navy could rationally conclude that homosexuality presented problems sufficiently serious to justify a policy of mandatory discharge while other grounds for discharge did not.
 
 
 [21]
 Professor Tribe argues that the holding of Doe might be only that no prosecution was threatened and therefore any adjudication of the merits was premature, see Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). One appellate court in New York has apparently adopted this interpretation of Doe, see New York v. Onofre, supra
 
 
 [22]
 The affidavit states in part:
 It is considered that administrative processing is mandatory. This is because it is perceived that homosexuality adversely impacts on the effective and efficient performance of the mission of the United States Navy in several particulars.
 (a) Tensions and hostilities would certainly exist between known homosexuals and the great majority of naval personnel who despise/detest homosexuality, especially in the unique close living conditions aboard ships.
 (b) An individual's performance of duties could be unduly influenced by emotional relationships with other homosexuals.
 (c) Traditional chain of command problems could be created, i. e., a proper command relationship could be subverted by an emotional relationship; an officer or senior enlisted person who exhibits homosexual tendencies will be unable to maintain the necessary respect and trust from the great majority of naval personnel who despise/detest homosexuality, and this would most certainly degrade the individual's ability to successfully perform his duties of supervision and command.
 (d) There would be an adverse impact on recruiting should parents become concerned with their children associating with individuals who are incapable of maintaining high moral standards.
 (e) A homosexual might force his desires upon others or attempt to do so. This would certainly be disruptive.
 (f) Homosexuals may be less productive/effective than their heterosexual counterparts because of:
 (1) Fear of criminal prosecution;
 (2) Fear of social stigmatization;
 (3) Fear of loss of spouse and/or family through divorce proceedings as a result of disclosure;
 (4) Undue influence by a homosexual partner.