David FALK, Plaintiff–Appellant,

v.

SECRETARY OF THE ARMY,
Defendant–Appellee.

No. 499, Docket 88–6133.

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 1988.

Decided March 30, 1989.

Hyman Goodman, New York City, for plaintiff-appellant.

Bernard W. Bell, Asst. U.S. Atty., S.D. N.Y. (Nancy Kilson, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., of counsel), for defendant-appellee.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

In 1964 appellant resigned from the United States Army as a result of his admitted homosexual conduct and was given an undesirable discharge. Years later he initiated and pursued a number of administrative proceedings, succeeding in upgrading his discharge from undesirable to honorable, and in having his 1964 medical diagnosis changed from homosexual to immature personality disorder. On this appeal he seeks an order compelling the Army to change the reason and the cited authority (the regulation on homosexual conduct) under which his military service was terminated.

The deference accorded administrative rulings is heightened when it is a military ruling that is being reviewed, requiring therefore a greater level of justification to overturn an administrative determination of the military. The end result is to reduce the scope of an appellate court's review of a military board's decision. Such a confined scope of judicial review to a large extent dictates the result of this appeal.

## I FACTUAL AND PROCEDURAL BACKGROUND

### A. *The 1964 Incidents*

David Falk, then recently divorced and a college dropout, enlisted on April 1, 1964 in the United States Army Reserves at age 22. His commitment required 20 weeks of training and active service, followed by five and a half years of periodic duty as a reserve. Twelve weeks into active training on July 2, 1964 Falk approached his commanding officer, First Lieutenant Jack M. Morrison, at the United States Army Base at Fort Dix, New Jersey, and admitted that he had recently engaged in two homosexual liaisons, and that he considered himself a homosexual.

Lt. Jackson thereupon initiated an investigation, required at that time under Army regulation AR 635–89(4)(b). The inquiry consisted of Falk undergoing interviews with two mental health specialists, Dr. Robert J. Sadoff, and Major Roy E. Baxter, and with members of the Army's Criminal Investigation Division (CID). In the course of this investigation Falk revealed that he had participated in two homosexual encounters while on leave at a hotel in Brooklyn Heights, New York during the evenings of June 5 and June 12, 1964 with a man named Carl Miller. Falk stated that the two encounters with Miller were his first and only homosexual acts, but that he had experienced homosexual fantasies before and subsequent to meeting Miller.

When asked why he had approached his commanding officer and confessed, Falk explained in a 1964 statement to members of the CID:

Ever since this happened with Miller I have been confused and upset.... I also have thought a lot of what happened when I was with Miller and it excites me to the point where I must masturbate every day to relieve my tensions. I am afraid that I will be tempted to have homosexual acts with members of my unit. I did not report this to Lt. Morrison to avoid my duty in the Army. I would be content to get my problem straightened out and stay in the Army.... I went to him, primarily to get medical help, and to tell him my problem.

Psychiatrist Sadoff and social worker Baxter, following their interviews with Falk, issued a neuropsychiatric report on July 6, 1964, in which they concluded: *"DIAGNOSIS:* sexual deviate, homosexual .... This man's personality disorder is of such severity that he cannot be expected to respond to counseling, transfer or confinement. This man's problem (homosexuality) is of such severity that he cannot be expected to function adequately in the military."

Upon receipt of the pertinent information, Lt. Morrison was required to designate Falk's homosexual conduct as falling within one of three classes. He designated

Falk as a Class II homosexual (Classes I and III are not pertinent to this appeal) that allowed Falk to accept discharge—resign—for the good of the Army pursuant to AR 635–89(6)(2)(a). Falk waived his right to a hearing and agreed to resign, and Lt. Morrison recommended an undesirable discharge. Falk was discharged on August 14, 1964, approximately the date at which the active component of his Army commitment ended.

## B. *Administrative and District Court Proceedings*

In 1977, 13 years later, after Falk heard President Carter announce a program to review less than honorable military discharges issued during the Vietnam era, he initiated a series of administrative appeals. Three of them were directed to the Army Discharge Review Board (Discharge Board), and three later appeals were directed to the Army Board for the Correction of Military Records (Records Board). Although it is the actions of the Records Board which are directly at issue on this appeal, we discuss briefly the proceedings before both Boards.

Falk requested the Discharge Board to upgrade his discharge, contending in an August 12, 1977 letter that, contrary to the neuropsychiatric report, his homosexual acts in 1964 were an aberration, attributable to emotional distress following his divorce. He also provided the Army with an update of his civilian life. The Discharge Board upgraded his discharge from dishonorable to general on May 23, 1977. And, upon further application—and receipt of many reference letters attesting to his commendable postservice conduct—the Discharge Board on May 1, 1978 upgraded Falk's discharge to honorable. Even though it recharacterized the discharge as honorable, the Board stated "the conclusion reflects that the applicant was properly separated, however the determination notes that the separation was not considered equitable under current conditions." The Board also noted that the neuropsychiatric evaluation "was adequate for homosexuality."

After receiving his honorable discharge, Falk's attempt to reenlist in the reserves was unsuccessful because his reenlistment code (RE–4) reflected that he had been dismissed for homosexual conduct. As a result, he requested the Discharge Board to change the reason and the cited authority given for his discharge. He sent two

new psychiatric reports by his own experts, Doctors Sherman F. Pazner and Max Brandt. Those doctors essentially agreed that Falk is not currently a homosexual, nor did they believe that he had been one in 1964. They explained that his homosexual conduct stemmed from a post-divorce depression. On the basis of these new psychiatric reports, Falk's attorney argued that the authority cited for his discharge was no longer accurate. The Discharge Board stated that it could not reconsider Falk's case and transferred his file to the Records Board.

Meanwhile the Records Board on May 30, 1979 had rejected Falk's request for a new reenlistment code and change of reason and authority for discharge. It concluded that the appropriate authority for discharge was the regulation on homosexual conduct, AR 635–89, and that no change in Falk's record was required. Falk reapplied to the Records Board by letter dated December 30, 1981. Acknowledging that in 1964 he "was not entirely honest with the authorities or with the examining psychiatrist . . . [I] exaggerated about my having homosexual tendencies. The truth is that I wanted very much to be out of the Army at that time. . . ." Conceding that he had experienced homosexual fantasies, he now claimed to have spent one, rather than two evenings with Miller, during which they had performed a number of homosexual acts, and explained that he had accepted Miller's sexual advances "not out of homosexual interest, but in part to be able to provide an example of such conduct . . . when the opportunity presented itself I realized that I could use it to help me get a discharge."

Upon receipt of this reapplication, the Records Board asked the Surgeon General for its opinion. The Surgeon General concluded on February 9, 1982 that the original medical diagnosis of homosexuality was unfounded, but noted "[u]nfortunately, at the time (1964) the individual apparently presented this to the psychiatrist as a 'reality.'" The Surgeon General recommended that the medical record diagnosis should read "Immature Personality Disorder" rather than "Homosexual." Thus, that government official maintained that "AR–209 [discharge from Army for persons with transient personality disorders] would have been more appropriate than AR–635–89 during those years."

The Records Board on August 11, 1982 accepted the Surgeon General's recommen-

dation to change Falk's medical diagnosis, but refused Falk's request to change the reason and authority for his discharge. A July 27, 1983 reapplication to the Board was unavailing. Because Falk has complained that the Records Board failed to explain adequately its reason for ruling against him, we set forth at some length in the margin the Board's reasoning and conclusion.[1]

Having exhausted his administrative remedies, Falk instituted the instant proceeding on March 2, 1987 by filing a complaint in the United States District Court for the Southern District of New York (Conboy, J.) that alleged ten causes of action against the Army. He contends that his initial discharge and the subsequent decisions of both the Discharge and Records Boards were arbitrary and capricious, not in accordance with Army regulations and not supported by substantial evidence as required by the Administrative Procedure Act (A.P.A.), 5 U.S.C. § 706(2)(A) (1982). Falk sought declaratory and injunctive relief to compel the Army to change the reason and authority cited for discharge; he also requested that his reenlistment code be changed or, alternatively, that the National Guard be ordered to allow him to reenlist, even though he is older than the maximum reenlistment age.

Both parties moved for summary judgment. Judge Conboy ruled in favor of the Army on a number of grounds. Falk appeals only the adverse summary judgment ruling on those claims that concern the Records Board's refusal to change the reason and authority given for his discharge.

## II  DISCUSSION

### A.  Scope of Review

It was once thought that courts had "no power to review" administrative decisions by the armed services. *See Reaves v. Ainsworth,* 219 U.S. 296, 304–06, 31 S.Ct. 230, 233–34, 55 L.Ed. 225 (1911); *see also* Lunding, *Judicial Review of Military Administrative Discharges,* 83 Yale L.J., 33, 59 (1973). Although it is now agreed that the judicial branch has jurisdiction to decide whether the Secretary of the Army has exceeded or disregarded the powers that Congress has delegated to him, a court's scope of review is limited. *See Harmon v. Brucker,* 355 U.S. 579, 581–82, 78 S.Ct. 433, 434–35, 2 L.Ed.2d 503 (1958) (per curiam).

Review is sought under § 706(2)(A) of the A.P.A. which permits courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Appellant also argues that the Records Board's decision was "unsupported by substantial evidence." § 706(2)(E). Obviously this standard of review is much more limited than when a court reviews a case *de*

---

1.  1.  It appears that the applicant has cleverly and successfully maneuvered himself into obtaining a discharge from the Army by reason of homosexuality, recharacterization of his undesirable discharge to fully honorable, change in medical diagnosis from "sexual deviate, homosexual" to "immature personality disorder," then stated that his prior admissions of homosexual tendencies were not true and that he had made the statement in order to obtain a discharge from the Army.

2.  The Board does not accept the applicant's contentions that his admitted homosexual acts, committed while in the military service, were in the category of having stemmed solely from immaturity, curiosity, or intoxication. The fact remains that the applicant did commit homosexual acts.

3.  The medical diagnosis of sexual deviate, homosexual, made in 1964 was only part of the record which resulted in the applicant's discharge. The Army policy, then as well as now, is to discharge persons who committed homosexual acts which are regarded as seriously impairing the accomplishment of the military mission.

4.  The change of the diagnosis of sexual deviate, homosexual, of 1964, made by opinion of the OTSG in 1982, does not eliminate the homosexual acts of the applicant and in itself still does not warrant a change in the reason or authority at time of his discharge in 1964.

5.  Army Regulation 635–89, dated 9 Sep 58, in effect at time of applicant's discharge, and current Army Regulation 635–200, dated 1 Oct 82, do not provide that a medical diagnosis of homosexuality as an absolute criterion for discharge under those regulations.

6.  The purpose of the Report of Separation (DD Form 214) is not intended to state the medical status or medical diagnosis of individuals being discharged.

7.  In view of the foregoing it is concluded there is no basis to change the reason and authority for the applicant's discharge, there is likewise no reason to change his reenlistment code.

DETERMINATION:  The applicant has failed to present sufficient relevant evidence to demonstrate the existence of probable material error or injustice to warrant a formal hearing.

*novo.* For example, when applying the arbitrary and capricious test, a court may not assess the wisdom of an agency's choice; inquiry is limited instead to whether the Board has made a clear error of judgment. *See, e.g., Hudson Transit Lines v. United States,* 765 F.2d 329, 336 (2d Cir.1985). Further, it is familiar law that an agency decision is supported by substantial evidence if there is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *See Consolidated Edison v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). If so, the agency's decision must be accepted even when the court would have drawn a different conclusion from the evidence. *See Local One, Amalgamated Lithographers v. N.L.R.B.,* 729 F.2d 172, 175–76 (2d Cir.1984). This has resulted in the rule that a court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

In addition to the requirements of A.P.A. § 706, we must give the Records Board's ruling increased deference because of the military context in which this appeal arises. This deference is often couched in terms of pragmatic limitations on the judiciary's institutional competence. Courts are not asked or expected to run the Army. *See Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842 (1953). In addition to this acknowledged lack of expertise, the animating principal which circumscribes our review is the doctrine of separation of powers. The Founders gave the role of Commander in Chief to the President. U.S. Const. Art. II, § 2; *see also The Federalist Papers* (Fairfield ed. 1981); No. 69, (Hamilton). It is Congress that was granted the power to declare war, raise and support armies, provide and maintain a Navy, make rules for the government and regulation of land and naval forces, and to provide for calling forth the militia. U.S. Const. Art. I, § 8.

In contrast, Article III contains no such textual commitment to judicial supervision of military decisions. For that reason judicial deference in the military context "is greater than [in] any other area," *Chappel v. Wallace,* 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983), because the military is a "separate community" from civilian society. *Orloff,* 345 U.S. at 94, 73 S.Ct. at 540. Even in those areas of

law where courts would ordinarily be obliged to examine a holding with strict scrutiny, when that holding emanates from a decision of the military the risk of encroaching upon the powers of another branch—and thereby interfering with questions of discipline and morale—significantly reduces the ordinary scope of review. *See Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (free exercise). Consequently, review of the decision made by the Records Board is tightly circumscribed by the confluence of A.P.A. § 706 and its military setting. Having said this much, we hasten to add that such a deferential standard of review should not be read as "no review," and as affording the military *carte blanche* in the disposition of matters that come before its administrative bodies.

### B. *Application to This Case*

#### 1. *Construction of the Regulations at Issue*

Congress has directed the Secretary of the Army to establish boards of civilians, which *"may* correct any military record of that department when he considers it necessary to correct an *error* or remove an *injustice."* 10 U.S.C. § 1552 (1982 and Supp. IV 1986) (emphasis added). This power to correct the record is discretionary. *See Wolfe v. Marsh,* 835 F.2d 354, 358–59 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 366, 102 L.Ed.2d 355 (1988); *see also Beller v. Middendorf,* 632 F.2d 788, 806–07 (9th Cir.1980) (refusal to delete reference to homosexual conduct in Navy record does not violate due process), *cert. denied sub nom., Miller v. Weinberger,* 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981); *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979).

The Army regulation under which Falk was discharged in 1964 was AR 635–89, which at the time governed the discharge of Army personnel for homosexual acts (it has since been superceded by AR 635–200). The rule of AR 635–89 and its superceding regulations is that the "prompt separation of homosexuals, as defined in these regulations, is mandatory." 635–89(2). An exception—which Falk invokes—is made for "[t]hose individuals who *solely* as a result of immaturity, curiosity, or intoxication have been involved in homosexual acts." AR 635–89(2)(b)(2) (emphasis added). Ap-

pellant argues that he falls within the immaturity ambit—and thus outside the scope of the rule—because his revised medical diagnosis describes him in 1964 as suffering from "immature personality disorder," and not from homosexuality. Falk's construction of the regulation, in effect, equates "immature personality disorder" with "immaturity"; he posits that a medical finding of the former requires a legal finding of the latter. On that basis he challenges the Army's decision to continue to cite rule of AR 635–89 as the authority for his discharge when, in his view, his diagnosis now describes him as falling within the exception.

The Army construes the exception in a different fashion, defining "immaturity" by its common usage rather than as a medical disorder. It maintains that Falk is ineligible for the exception because he did not engage in homosexual conduct *solely* as a result of immaturity. The Army contends that the exception is reserved for personnel who perform an isolated homosexual act exclusively because of youthful poor judgment.

In choosing among these disparate readings of the exceptions to 635–89, we must bear in mind that courts generally defer to an agency's interpretation of its own regulation unless that interpretation is plainly erroneous. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977).

■ We hold that the Secretary's interpretation of the exception—which actually is a paraphrase of that exception—cannot be said to be plainly erroneous or unreasonable, and hence not violative of A.P.A. § 706.

#### 2. *Substantial Evidence*

■ We next address whether the Army's determination that Falk did not fall within AR 635–89's exception was supported by substantial evidence. The issue is whether there is substantial evidence that appellant's homosexual conduct was not solely the result of immaturity. The record reveals a plethora of evidence supporting this conclusion, provided chiefly by Falk himself. To begin with, it was appellant who disclosed these acts by confessing to his commanding officer, and his subsequent recantations do not purport to contradict the initial admission that he engaged in homosexual acts. What is less clear is Falk's motivation for his liaisons

with Miller. Falk attributes this conduct to his immaturity, distress at his divorce, fantasies about Miller, and a desire to get out of the Army. This variety of explanations lends support to the conclusion that the exception to AR 635–89 does not govern here, because it applies only if the homosexual conduct was *"solely* the result of immaturity."

The evidence Falk initially provided during the 1964 investigation suggests that one of his motivations was sexual desire. He stated that he "often thought a lot of what happened when I was with Miller and it excites me...." Falk's "new evidence," consisting of statements by his own psychiatrists, does not negate this inference, even though these statements assert that in 1980 Falk's sexual orientation is not—and was not in 1964—homosexual. Dr. Pazner notes that Falk had experienced "homosexual fantasies" even before he enlisted in the Army. This continued preoccupation with his possible homosexuality in addition to shedding light on Falk's motivation, also supports the Army's contention that the acts were not an isolated episode and might reoccur.

Falk supplies further proof that contradicts his immaturity argument. In his December 30, 1981 letter—in which he conceded that he had not been "entirely honest"—Falk explains that one reason he had sex with Carl Miller was to get out of the Army: "I realized that I could use it [the liaison with Miller] to help me get a discharge." This calculated decision to obtain discharge by providing an example of homosexual conduct does not paint a picture of immaturity. On the contrary, it displays shrewdness in manipulating the system.

Appellant also discusses the devastating impact of his divorce, and attributes his affair with Miller as a reaction to the loss of his wife. Although the divorce may partly explain Falk's actions—and there is no reason to doubt the sincerity of his distress—it does not follow that the Army's decision was unsupported by substantial evidence, because AR 635–89's exception applies to homosexual conduct caused by immaturity, not by loneliness.

In sum, the variety of ways in which Falk rationalizes his behavior presents credible proof that his acts were not solely the result of immaturity, even assuming immaturity was a contributing factor. We must conclude therefore that the Records Board's decision is supported by substantial evidence.

### 3. Divergence Between the Diagnosis and Reason for Discharge

■ Falk's final argument is that the Records Board abused its discretion when, notwithstanding the revised diagnosis that he is not a homosexual, it retained homosexual conduct as the reason given for his discharge.

As the Records Board explained to Falk in its decision of July 23, 1983, recited in footnote 1, the regulations do not require that the reason and authority for discharge and the diagnosis be the same. The original diagnosis in the 1964 neuropsychiatric report was plainly a factor in determining whether and under which regulation to discharge Falk. But it was not the sole criteria—and probably not even the most important factor—given Falk's admission of homosexual conduct. As Falk has not recanted the fact of the conduct, the reason for discharge remains correct. Moreover, it is not surprising that the Army would accept the Surgeon General's recommendation on the medical diagnosis—an area of the Surgeon General's expertise—but maintain its own position on the correct authority for Falk's discharge. *Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980), is factually similar to the case at bar and supports this conclusion. There, one of the appeals concerned Navy Yeoman Miller, who during an investigation admitted that he had engaged in homosexual conduct. The Navy medical officer who examined Miller "found that despite plaintiff's admitted homosexual episodes, he does not appear to be a 'homosexual.'" *Id.* at 794. The doctor recommended that Miller be retained. The Secretary of the Navy nonetheless discharged him, and the Ninth Circuit rejected his due process arguments and upheld the discharge, even though the diagnosis and reason for discharge decision diverged. *See id.*

■ Falk also complains that the Army's explanation for its decision is inadequate. Although the Army does not indicate how it weighed the various inputs into its decision-making process, it sufficiently delineated what it considered to permit judicial review of its reasoning. *See Neal v. Secretary of the Navy,* 639 F.2d 1029, 1038 (3d Cir.1981); *Matlovich v. Secretary of the Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978); *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 778–80 (2d Cir.1972); *Kalista v. Secretary of the Navy,* 560 F.Supp. 608, 613 (D.Col.1983) (requirement that Army give reasons for its decision does not man-

date an "extensive exegesis" of those reasons). We are further satisfied that the Army has clearly explained that the medical diagnosis was not its sole criteria. *Cf. Wolfe,* 835 F.2d at 356–57 n. 3 (argument that Records Board's refusal to upgrade discharge must be overturned because documents were missing from the file is frivolous given that plaintiff had admitted content of the missing documents).

Nor are we willing to create a requirement that a change in diagnosis requires a change in the reason and authority given for a discharge. Such would transfer the discretion to correct records from the Records Board to the Surgeon General, contravening § 1552. The task of determining the relevance of a medical diagnosis when an individual is discharged for homosexual conduct must be left to the political branches.

Another reason to decline engrafting a rule requiring a diagnosis of homosexual orientation as a prerequisite to a discharge for homosexual conduct, as appellant urges, is that to do so would arguably penalize military personnel for their status as homosexuals. A regulation discharging military personnel for sexual orientation may well be subject to constitutional challenge. *Cf. Watkins v. United States,* 837 F.2d 1428, 1438 n. 14 (regulation barring homosexuals from army violates equal protection), *reh'g granted en banc,* 847 F.2d 1362 (9th Cir.1988). We express no view on this issue that is not before us, except to refuse to craft a rule that may be constitutionally infirm.

Finally, common sense argues that the diagnosis and the reason for discharge need not be the same. They serve different purposes. The diagnosis must accurately describe an ailment so that a doctor can effectuate a cure. A discharge reason and authority, in contrast, explains why the conduct engaged in—which may or may not be symptomatic of an illness—is prohibited in the Army. From the Army's perspective, it makes no difference what Falk's emotional problem is labeled: it is the manifestation of that emotional problem in the form of homosexual behavior that justifies giving the reason and authority for the discharge as AR 635–89. *Cf. Rich v. Secretary of the Army,* 735 F.2d 1220, 1225 n. 4 (10th Cir.1984) (requiring the Army to view homosexuality as a medical defect is " 'sophistry' "). The Army's interest is in preventing and halting conduct that undermines discipline and morale.

Because Falk's homosexual conduct still is conceded, no change of the authority and reason for discharge given is required. Inasmuch as the original reason and authority for discharge was and remains accurate, we hold that the Records Board's refusal to change the reason and authority for discharge was not an abuse of its discretion.

### III  CONCLUSION

The district court's judgment granting summary judgment in favor of the Secretary of the Army is affirmed.

OAKES, Chief Judge (concurring):

I concur in the result.