**06-3307-cv**
**Dibble v. Fenimore**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: March 20, 2008        Decided: October 7, 2008)

Docket No.  06-3307-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONALD J. DIBBLE,

        Plaintiff-Appellant,

                v.

JOHN H. FENIMORE, Major General, New York Air National Guard,

        Defendant,

SECRETARY OF THE AIR FORCE,

        Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, STRAUB, and KATZMANN, Circuit Judges.

    Appeal from a grant of summary judgment in favor of the

Secretary of the Air Force, by the United States District Court

for the Northern District of New York (Lawrence E. Kahn, Judge).

We hold that the doctrine of intramilitary immunity does not

preclude a federal court from reviewing a challenge under the

Administrative Procedure Act to a decision by the Air Force Board

for the Correction of Military Records.  We also hold that the

district court correctly found that the Board's decision was not

1

arbitrary, capricious, contrary to law, or unsupported by substantial evidence.  We therefore affirm.

DANIEL M. SCHEMBER, Gaffney & Schember, P.C., Washington, D.C., for Plaintiff-Appellant.

PAULA RYAN CONAN, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, on the brief), Syracuse, New York, for Defendant-Appellee.

WINTER, Circuit Judge:


INTRODUCTION

Donald J. Dibble is a former federal excepted service technician with the New York Air National Guard ("Guard") who was denied reenlistment.  Alleging that this denial was retaliation for Dibble's exercise of his constitutional and statutory rights, including his advocacy as a union representative, Dibble applied for administrative relief from the Air Force Board for the Correction of Military Records ("Board").  When the Board denied his application, Dibble filed the present action under the Administrative Procedure Act, 5 U.S.C. § 702, against the Secretary of the Air Force ("Secretary").[1]  Judge Kahn granted the Secretary's motion for summary judgment.  Dibble v. Fenimore,

---

[1] Defendant John H. Fenimore was dismissed from this action by this Court's decision in Dibble v. Fenimore, 339 F.3d 120 (2d Cir. 2003).

2

488 F. Supp. 2d 149 (N.D.N.Y. 2006).

For the reasons stated <u>infra</u>, we conclude that the doctrine of intramilitary immunity does not preclude judicial review of the Board's decision and that the Board's decision was not arbitrary or capricious, or unsupported by substantial evidence. We therefore affirm.

BACKGROUND

Dibble was formerly a staff sergeant with the New York Air National Guard, a reserve component of the United States Air Force. 10 U.S.C. § 10101(5). His position was that of a federal excepted service Guard-Technician -- a dual-status, hybrid position in which civilian employment is contingent upon continued military membership. 32 U.S.C. § 709(b)(2) (providing that a civilian technician must be "a member of the National Guard").[2] <u>See also</u> 32 U.S.C. §§ 709(a),(e) (defining and authorizing Guard technicians). From 1989 until 1992 Dibble also served as a union steward for the Association of Civilian Technicians at Stewart Air National Guard Base. In May 1994 the Guard notified Dibble that he would not be allowed

---

[2] Guard-Technicians are uniformed servicemen and women who must hold the military grade specified by the service Secretary for their positions. 32 U.S.C. §§ 709(b)(3) & (4). Guard-Technicians were granted federal employee status by the National Guard Technicians Act of 1968, codified at 32 U.S.C. § 709, principally in order to provide them with uniform federal fringe and retirement benefits instead of benefits that varied from state to state. <u>Singleton v. Merit Sys. Prot. Bd.</u>, 244 F.3d 1331, 1334 (Fed. Cir. 2001).

to reenlist when his enlistment expired in October 1994. The Guard cited Dibble's "performance in a military capacity" as the reason for this decision. This act terminated Dibble's eligibility for civilian employment with the Guard.

a) Factual Disputes

The proper characterization of the events leading to the denial of reenlistment is hotly disputed. The government presented evidence to the Board that between 1990 and 1994 Dibble was involved in physical altercations with other Guard members while on duty; sometimes intimidated other members of his unit; threatened his superiors; propelled a knife across a table at a fellow Guardsman; and committed various other infractions. In one incident, Dibble was suspended for pushing another staff sergeant while the two were working on a platform twenty feet above the ground. Dibble successfully challenged that suspension when a hearing examiner found that the physical contact was not sufficiently forceful or malicious to cause death or serious injury. Nevertheless, the hearing officer observed that Dibble was "an aggressive individual with an intimidating demeanor," who, when administered the oath prior to testifying, "assumed a stance that gave the appearance of impending hand to hand combat." Dibble's supervisors also described him as running "hot and cold" with his ability to handle authority or direction.

In May 1994, Dibble's immediate supervisor, Master

4

Sergeant John Maloney, strongly recommended that Dibble be denied reenlistment. Maloney described Dibble as anti-establishment, disruptive, and generally disobedient. Based on personal observations of Dibble's commanding officer and the recommendations of Dibble's past and present supervisors, the Guard declined to allow Dibble to reenlist. Dibble, by contrast, characterizes the Guard's version of the facts as pretexts for an impermissible motivation -- namely, retaliation for Dibble's success in vindicating his and others' rights.

Dibble offers a number of instances during the period from 1990 through 1993 in which he allegedly received hostile treatment as a result of representing the interests of union members and challenging management practices. Among those instances was an episode in which a supervisor allegedly threatened to "get [Dibble] on the military side" because the supervisor could not "get him" on the technician or civilian side. Twenty-two fellow Guard members signed a document stating that many other Guard members had committed worse infractions than Dibble and yet had been allowed to reenlist. The signees further stated that Dibble had not been allowed to reenlist because of "his willingness to stand up and speak up for himself and others, his highly effective service as a union steward, and his success in defeating [an] attempt to suspend him from his job." Dibble further claims that his supervisor

5

was aware of this hostility but told others that there was nothing that could be done for Dibble's career.

Dibble himself claims that he was issued formal Letters of Reprimand when others were merely orally counseled; that his supervisors tried to suspend him for thirty days for conduct that was less serious than that usually tolerated by management (the alleged shoving of a co-worker on a platform twenty feet in the air); and that his supervisors told other Guard members to lie so that Dibble could be singled out for not complying with safety regulations that, he claims, other Guard members routinely ignored.

After being denied reenlistment, Dibble requested relevant records concerning his performance. He received twenty-five documents recording transgressions which Dibble asserts were only minor -- e.g., tardiness, unexcused absences, and infractions of uniform requirements. According to Dibble, the fact that these incidents were even recorded indicates an improper motive, because, he claims, such incidents usually were either dealt with through discussion or ignored altogether. Dibble also alleges that his supervisors started cracking down on him only after his union activities accelerated. He maintains that prior to 1990, if he was late or missed work due to illness, his supervisors would simply ask him what had happened, but that this practice changed after he became a union steward.

6

Dibble also cites two instances of forgery in which the men involved were punished but not denied reenlistment. Finally, Dibble asserts that the government has produced no document indicating that any other Guard member was denied reenlistment for military performance comparable to Dibble's.

b) <u>Procedural History</u>

Dibble properly exhausted his intramilitary administrative remedies. He first requested an investigation by the Air Guard Inspector General, who upheld the denial of reenlistment as a proper exercise of "command prerogative." Dibble next sought relief through two separate channels -- the federal courts and the Air Force Board for the Correction of Military Records.

Dibble brought suit in the Northern District against John H. Fenimore, the Commander of the New York Air National Guard, asserting that the denial of reenlistment was in retaliation for his constitutionally and statutorily protected activities as a union steward.[3] On an interlocutory appeal, we held that the doctrine of intramilitary immunity rendered Dibble's claim

---

[3] Dibble claimed that he was denied reenlistment "as a result of his exercise of (1) his right under 5 U.S.C. § 7102 to assist and act for a labor organization; (2) his right under 32 U.S.C. § 709(e)(5) (since recodified as 32 U.S.C. § 709(f)(4)) and Technician Personnel Regulation (TPR) 752 § 2-17, Element 6(b), to appeal (successfully) his thirty-day suspension from employment; and (3) his First Amendment right to associate in a union and to speak freely in furtherance of his and fellow employees' rights." <u>Dibble v. Fenimore</u>, 339 F.3d 120, 122 n.3 (2d Cir. 2003) ("<u>Dibble I</u>").

against the military commander non-justiciable. <u>Dibble I</u>, 339 F.3d at 125, 128. While declining to adopt a categorical rule regarding the justiciability of intramilitary suits, we refused "to insert the federal courts into military decisionmaking in such an intrusive manner." <u>Id.</u> at 128. Because Dibble's claim challenged a military personnel decision about fitness for service, we concluded that adjudicating the claim would require that the district court "make a particularized inquiry into the mindset of his superior officers, determining whether their various disciplinary actions were motivated by proper military concerns or by the unconstitutional desire to stifle Dibble's protected First Amendment activity." <u>Id.</u> Pursuant to <u>Dibble I</u>, the district court dismissed Dibble's claims against Fenimore.

Dibble also applied to the Air Force Board for the Correction of Military Records for relief. The Board is a civilian review board with the authority to grant relief to applicants who, <u>inter alia</u>, have "demonstrated the existence of a material error or injustice that can be remedied effectively through correction of the applicant's military record." 32 C.F.R. §§ 865.2(a), 865.4(<i>l</i>)(4); <u>see also</u> 10 U.S.C. § 1552(a) (authorizing the Secretaries of the military departments, acting through civilian review boards, to correct military records when necessary to correct an error or remove an

8

injustice).[4]

Dibble's application claimed that he had been denied reenlistment in retaliation for his "proper outspokenness," his "effectiveness as a technician union steward," and his having defeated an "improper effort" to suspend him. He requested a correction of his records to "show that he was not denied reenlistment; he was not discharged; he served continuously to the present; he is entitled to back pay, benefits, and credit; and he is eligible to reenlist." The Board denied his application, finding "insufficient evidence of error or injustice to warrant corrective action."

Dibble filed a supplemental complaint in the Northern District against the Secretary, seeking review of the Board's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Based in significant part on a document stating that the Guard had found Dibble eligible to reenlist, a document that only later was discovered to have been erroneous, the district court held that the Board's decision was arbitrary and capricious and remanded the case to the Board for further administrative proceedings. Dibble v. Fenimore, 84 F. Supp. 2d 315, 321-22 (N.D.N.Y. 2000); Dibble v. Fenimore, 488 F. Supp.

---

[4] "[The Board] is not an investigative body." 32 C.F.R. § 865.2(c). Normally, it determines cases on the record established prior to the application. "However, the Board may, in its discretion, hold a hearing or call for additional evidence or opinions in any case." Id.

2d 149, 157 (N.D.N.Y. 2006) (noting that the relevant document was the result of an "administrative error").

The district court also instructed the Board to answer the following five questions on remand:

> (1) Whether Plaintiff's Air Guard superiors were hostile toward him because of his past union activities;
>
> (2) Whether Plaintiff's Air Guard superiors punished Plaintiff, but not other Air Guard members, for minor transgressions;
>
> (3) Whether Plaintiff's Air Guard superiors sought to suspend Plaintiff for purported misconduct that was far less serious than misconduct by other Air Guard members that they ignored;
>
> (4) Whether Plaintiff's Air Guard superiors desired to retaliate against Plaintiff because he defeated their attempt to suspend him; and
>
> (5) Whether Plaintiff's Air Guard superiors denied Plaintiff reenlistment in the Air Guard, and thus terminated his employment, for pretextual reasons that would apply to many Air Guard members who were *not* denied reenlistment -- pretextual reasons that were "far less significant than misconduct by others" who were not barred from reenlistment.

Dibble, 84 F. Supp. 2d at 322. The district court directed the Board to make "specific and numbered findings of fact, and

10

conclusions of law based on such factual findings," as to each of Dibble's claims, taking special care to enunciate a reason for its decision that the district court would be able to evaluate under the APA's "arbitrary and capricious" standard. Id.

On remand, a majority of the Board again voted to deny Dibble's application for relief. The Board made five specific findings:

First, even though Dibble's superiors may have had some hostility to him on account of his union activity, in light of all the evidence the Board was not convinced that this hostility motivated the denial of reenlistment. Given Dibble's "numerous infractions of military discipline," the Guard's decision that Dibble "was not suitable for military service" was "neither arbitrary nor capricious."

Second, the Board was not convinced that Dibble's superiors had punished him but not others for minor transgressions. That Dibble had received a Letter of Reprimand when some others might not have was, in the Board's view, more plausibly the consequence of the fact that Dibble had a pattern of disciplinary infractions.

Third, it found that the Guard's attempt to suspend Dibble for the incident on the elevated scaffold was not untoward, even in light of the disciplinary handling of other Guard members. Dibble's actions were inappropriate and in violation of established safety procedures, while the incidents involving

other Guard members, "unlike the applicant's repeated actions, were not caused by the same individuals."

Fourth, the Board was not convinced that Dibble's superiors had sought to retaliate against him because he had successfully appealed his suspension for the incident on the elevated platform. The Board noted that the Guard's preparation of most of the documentation about Dibble's infractions had occurred before the results of the appeal had been released, and Dibble did not allege that those documented infractions had not in fact occurred.

Fifth, the Board did not find that the Guard's denial of reenlistment was pretextual. It found instead that Dibble was denied reenlistment "because his conduct was not consistent with that required of a military member." The Board also said that there was no evidence suggesting that other Guard members with "extensive record[s] of bearing and behavior problems" comparable to Dibble's had been allowed to reenlist.

The Board concluded that Dibble had failed to demonstrate that he had been "the victim of an error or injustice." (One Board member dissented, stating that he felt Dibble was denied reenlistment "in retaliation for his actions as a shop union steward and/or to prevent his continued employment in his civilian job.")

After the Board issued this decision, Dibble filed a second supplemental complaint in district court seeking to overturn the

12

decision. The district court found that the Board had complied with its instructions on remand. Dibble, 488 F. Supp. 2d at 156-58. The court also concluded that the administrative record demonstrated numerous instances of misconduct and infractions of military discipline occurring after Dibble's activity as a union steward and before he was denied reenlistment, and thus that denial of Dibble's reenlistment had a factual basis "that has all to do with military deportment and behavior, and little or nothing to do with constitutionally protected activity." Id. at 158-59.

The court declined to address Dibble's claims that other Guard members who had committed acts of insubordination or misconduct had not been denied reenlistment, refusing to "place itself in the position of reviewing an entire series of military personnel decisions from over a decade ago, and then presume to tell military officials of the Executive Branch how best to hire, retain, discharge or promote members of the United States Armed Forces." Id. at 161. The court, however, both noted that the Board addressed Dibble's claims with respect to this issue and explained why another Guard member, who was specifically identified by Dibble, was stripped of supervisory authority and reassigned as opposed to denied reenlistment. Id. at 161 n.6. The court also noted that the Board found that Dibble did not present any evidence, nor was any contained in the record, that the individuals about whom Dibble complained had records of

13

behavioral problems that matched or exceeded his. Id. at 161 n.7. Dibble then brought this appeal.

DISCUSSION

a) Justiciability and Intramilitary Immunity

We first address the threshold question of whether the doctrine of intramilitary immunity bars us from reviewing the Board's decision to reject Dibble's application for relief.

The doctrine of intramilitary immunity emerged from the Supreme Court's holding, in Feres v. United States, 340 U.S. 135 (1950), that the Federal Tort Claims Act ("FTCA") does not permit military personnel to sue the United States government for compensation for injuries that "arise out of or are in the course of activity incident to service," even if those injuries would be otherwise actionable under the FTCA. Id. at 146. The Court's reasoning in Feres was confined to the FTCA, but, as we noted in Overton v. New York State Division of Military & Naval Affairs, 373 F.3d 83 (2d Cir. 2004), subsequent judicial decisions have significantly expanded the intramilitary immunity doctrine and "it now generally protects the government from suit for injuries arising from 'activit[ies] incident to [military] service.'" Id. at 89 (quoting United States v. Stanley, 483 U.S. 669, 681 (1987)); see also Chappell v. Wallace, 462 U.S. 296 (1983) (holding that enlisted servicemembers could not bring Bivens-style suits seeking damages from their superior officers for alleged constitutional violations); Jones v. N.Y. State Div. of

14

*Military & Naval Affairs*, 166 F.3d 45, 50-52 (2d Cir. 1999) (holding the intramilitary immunity applies to suits for damages under 42 U.S.C. § 1983).

In <u>Dibble I</u>, we held that the doctrine is not limited to actions for damages but applies also to some claims for equitable relief. <u>Dibble I</u>, 339 F.3d at 127-28. We thus ordered dismissal of Dibble's suit against his military commander. <u>Id.</u> at 128. However, we also noted that the doctrine's scope "is not precisely defined," <u>id.</u> at 125, and we "decline[d] to adopt a categorical rule on the justiciability of intramilitary suits." <u>Id.</u> at 128.

The question here is whether the doctrine applies also to suits for review of decisions of civilian review boards with respect to military personnel decisions. Arguably it might. The doctrine appears to be both an application of justiciability concerns and a canon of construction that limits the reach of statutes of general applicability into military affairs when Congress has not explicitly provided for application to the military. <u>Cf.</u> <u>Stanley</u>, 483 U.S. at 683 ("The special factor that counsels hesitation [before allowing <u>Bivens</u> actions for injuries incident to military service] is . . . the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate.") (internal brackets and quotation marks omitted). The APA contains no explicit provision for review of agency decisions involving military affairs. However,

15

we are bound by ample precedent that the intramilitary immunity doctrine does not universally bar judicial review of decisions by Boards for the Correction of Military Records.

In Falk v. Secretary of the Army, 870 F.2d 941 (2d Cir. 1989), we reviewed an Army Board for the Correction of Military Records decision not to alter the officially stated reason for a reservist's discharge. In Blassingame v. Secretary of the Navy, 866 F.2d 556 (2d Cir. 1989), we reversed dismissal of a former Marine's claim against the Board for the Correction of Naval Records concerning a petition to upgrade his military discharge from "undesirable" to "honorable." See also Kreis v. Sec'y of the Air Force, 866 F.2d 1508, 1511-12 (D.C. Cir. 1989) (although a claim for retroactive promotion was a non-justiciable military personnel decision, alternative claims for the correction of military records were justiciable); Watson v. Ark. Nat'l Guard, 886 F.2d 1004, 1008 n.10 (8th Cir. 1989) (action taken by the Army Board for the Correction of Military Records was reviewable under the "arbitrary and capricious" standard); Neal v. Sec'y of the Navy, 639 F.2d 1029, 1037 (3d Cir. 1981)(decisions of boards for the correction of military records can be reviewed judicially for arbitrariness and capriciousness).

This caselaw takes note of the facts that the Board is made up of civilians and that it is authorized, with minor exceptions, only to correct military records. 10 U.S.C. § 1552(a)(1); 32

16

C.F.R. §§ 865.1, 865.2(a).[5] Thus, it has limited power and interferes only minimally with the cohesiveness and efficiency of existing military hierarchies and operations. Moreover, courts do not review the Board's decisions de novo, but only under the deferential standard of whether the decisions were arbitrary, capricious, or unsupported by substantial evidence. Chappell, 462 U.S. at 303.

The Secretary suggests that "[i]t was arguably beyond even the broad authority of the Board to undertake such a particularized review of the New York Air National Guard's decisions" involved in denying Dibble reenlistment. The Secretary also argues that the Board's detailed analysis of the facts of this dispute, conducted pursuant to the district court's instructions on remand, in essence required that the Board "inquire into 'the mindset of [Dibble's] superior officers,' and . . . determine whether their actions 'were motivated by the unconstitutional desire to stifle Dibble's protected First Amendment activity' -- precisely the inquiry this Court later found to be non-justiciable by federal courts in Dibble I."

---

[5] The Board also has limited additional authority in the special case of whistleblowers. "When an applicant alleges reprisal under the Military Whistleblowers Protection Act, 10 U.S.C. 1034, the Board may recommend to the Secretary of the Air Force that disciplinary or administrative action be taken against those responsible for the reprisal." 32 C.F.R. § 865.2(b). Because Dibble is not invoking this Act, this additional Board authority is irrelevant to the case before us.

The Board's statutory authority to correct military records includes "injustice[s]" as well as clerical errors. While the inquiry ordered by the district court may be near the edge of the Board's authority, it did not exceed that authority as recognized in the caselaw discussed earlier. See, e.g., Blassingame, 866 F.2d at 559-60. At this stage of the proceeding, Dibble does not seek reinstatement, and, given the facts that the Board denied relief and we leave that denial in place, there is no reason for us to explore further the scope of the Board's authority.

b)    Merits of Dibble's Claim

1) Standard of Review

As noted, rulings of a Board for the Correction of Military Records can be set aside only if they are arbitrary, capricious, or unsupported by substantial evidence. Chappell, 462 U.S. at 303; see also 5 U.S.C. § 706(2). In determining whether the Board's decision was arbitrary or capricious, "a court may not assess the wisdom of an agency's choice; inquiry is limited instead to whether the Board has made a clear error of judgment." Falk, 870 F.2d at 945. And in determining whether the Board's decision was not supported by substantial evidence, if "there is such evidence as a reasonable mind might accept as adequate to support a conclusion" then "the agency's decision must be accepted even when the court would have drawn a different conclusion from the evidence." Id. (internal quotation marks omitted). The deference that courts must show the agency's

18

decision increases when, as here, the decision involves a military context.  Id.

2) Claims

Our own review of the Board's decision cures two grounds for reversal asserted by Dibble:  (i) the district court improperly relied on grounds that had not been asserted by the Board; and (ii) the district court erred by not reviewing the Board's conclusion that no punishment imposed on the grounds of enforcing military discipline was actually based on a retaliatory motive. We turn therefore to Dibble's claims that the Board applied the incorrect legal standard in its review and that the Board's rejection of Dibble's application was arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

The Code of Federal Regulations requires that applicants before the Air Force Board for the Correction of Military Records provide "sufficient evidence" of "probable material error or injustice."  32 C.F.R. § 865.4(a).  Dibble contends that the Board's review of the Guard's decision erred in applying an "arbitrary and capricious" standard rather than reviewing for "probable material error and injustice."

The Board's report states that the Guard's conclusion that Dibble was unfit for military service was "neither arbitrary nor capricious," from which Dibble concludes that the Board applied the incorrect legal standard.  However, despite the isolated use of the term "arbitrary [and] capricious," the Board's overall

19

analysis was fully consistent with the "sufficient evidence of probable material error or injustice" standard. The Board concluded that it was "not persuaded that [Dibble's] superiors punished him, and not other [Guard] members for minor transgressions"; concluded that it was "not convinced the applicant's superiors sought to retaliate against him because of his successful appeal [of his suspension for shoving a co-worker]"; and declared that it did "not find that the applicant was denied reenlistment for pretextual reasons that would apply to many Air Guard members who were not denied reenlistment."

In discussing that final point, the Board referred to yet another standard of review, asserting that "[a]bsent a showing of evidence that the denial of [Dibble's] reenlistment was an abuse of the commander's discretionary authority, we find no basis to overturn this decision." However, once again the Board's actual analysis is the equivalent of an examination for material error or injustice. The Board stated that Dibble was denied reenlistment "because his conduct was not consistent with that required of a military member." The Board added that both the administrative actions taken against Dibble and the decision not to permit him to reenlist "were based upon his repeated violations of military standards." The Board also noted a lack of "any evidence that suggests that any [Guard] member with an extensive record of bearing and behavior problems comparable to the applicant, was permitted to reenlist in the [Guard]." And,

20

in summarizing its findings and stating its recommendation, the Board explicitly invoked the proper standard twice: "In summary, based on the additional documentation provided, we do not find that the applicant has substantiated that he has been the victim of an error or injustice," and "A majority of the Board finds insufficient evidence of error or injustice and recommends the application be denied." Accordingly, we find that the Board did not apply an incorrect legal standard when conducting its review.

Dibble's contention is that the Guard denied him permission to reenlist because his superiors wanted to retaliate for Dibble's exercise of his constitutional and statutory rights and that the reasons of military suitability that the Guard gave were pretexts for this impermissible motive.

Dibble asserts that because pretext is at issue, we should determine whether the Board complied with the analytical approach described in Mt. Healthy City School Distict Board of Education v. Doyle, 429 U.S. 274, 287 (1977), for dealing with suits alleging that termination of the plaintiff's employment was retaliation for constitutionally protected conduct.[6]

---

[6] The Secretary argues that because Mt. Healthy dealt with suits by civilian plaintiffs against civilian employers it should not be imported into a military context. The Secretary's contention about the general inapplicability of Mt. Healthy in a military context conflicts with MacFarlane v. Grasso, 696 F.2d 217 (2d Cir. 1982). In that case, we explicitly applied the Mt. Healthy analysis to a suit by an Army reserve officer who claimed that his application for an open position as a stock control officer in the Connecticut Army National Guard had been rejected in retaliation for his exercise of his First Amendment rights.

21

However, Dibble's Mt. Healthy argument is a red herring. The Mt. Healthy procedure consists of three steps. In the first step, the complainant must show that his conduct was "constitutionally protected." In the second step, the complainant must show that this protected conduct "was a 'substantial factor' -- or to put it in other words, that it was a 'motivating factor'" in the adverse employment decision. If the complainant successfully shoulders both of these burdens, then in the third step the employer has the burden of showing, by a preponderance of the evidence, that it would have arrived at the same employment decision "even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287.

In the present case, the Board found against Dibble in the second step. It stated that Dibble's "reenlistment was denied because his conduct was not consistent with that required of a military member. In addition, all of the administrative actions taken against him and the denial of his reenlistment were based upon his repeated violations of military standards." Step two is indistinguishable from the requirements of 32 C.F.R. § 865.4(a): "The applicant has the burden of providing sufficient evidence of probable material error or injustice." Mt. Healthy's significance is in step three, which establishes a defense available to employers who have been found to have acted on an

impermissible motive.  Because Dibble never got beyond step two, and what Mt. Healthy says about step two adds nothing to the pertinent law applicable to Dibble, Mt. Healthy has no independent significance in this matter.

Dibble offers a fusillade of unpersuasive arguments that the Board's judgment was arbitrary, capricious, or unsupported by substantial evidence.  The Board's findings with respect to Dibble's military performance were supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion" that Dibble had failed to demonstrate probable material error or injustice in the denial of permission to reenlist.  Falk, 870 F.2d at 945 (internal quotation marks omitted).  Among the considerations that the Board explicitly noted were evidence that Dibble:  (i) was disrespectful to his superiors, (ii) manifested a lack of judgment, (iii) was aggressive and belligerent, and (iv) had committed repeated infractions of Air Force regulations and military discipline.

Dibble challenges the sufficiency of this evidence on two grounds:  the Board failed to consider significant, "undisputed" evidence that favored Dibble, and the adverse evidence upon which the Board had relied was a record created by Dibble's superiors to provide a pretext.

Dibble supports these propositions principally with assertions by various people that Dibble was disciplined for actions that other Guard members were not disciplined for, and

23

that other Guard members who committed infractions that were at least as serious as Dibble's were nevertheless permitted to reenlist. Dibble also recounts remarks made to him -- for example, a superior threatening to "get" Dibble, and a colleague saying that he had heard that Dibble's superiors were hostile to him.

Dibble's arguments depend upon three assumptions, each of which is wrong. The first is that the Board must state in writing each matter that it considered with an accompanying analysis. Dibble asserts that failure "to consider and make written findings on all significant points" is sufficient to render a Board decision arbitrary and capricious, and Dibble considers each one of the pieces of "undisputed" evidence mentioned earlier to be significant and to have gone unconsidered. However, the Board was not required to provide "written findings" about every piece of evidence that it considered. Agencies need only "articulate a rational connection between the facts found and the choice made," and a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) (internal quotation marks omitted); see also New England Health Care Employees Union v. NLRB, 448 F.3d 189, 194 (2d Cir. 2006); Frizelle v. Slater, 111 F.3d 172, 176-77 (D.C. Cir. 1997). Nor do policy considerations favor such a rule. Requiring agencies

24

to give explicit notice of every piece of evidence that they consider and find unpersuasive would merely multiply the length of agency decisions, and the time taken in rendering them, with no significant increase in clarity or utility.

Dibble's second erroneous assumption is that the Board's deliberations did not include anything other than the results of the Inspector General's inquiry, memoranda of records showing Dibble's lack of judgment, and Dibble's own "admitted lack of military deportment." Dibble appears to have made this assumption on the ground that those three items were the only items mentioned in a list that the Board introduced with the words "in consideration of all the evidence in this case collectively, i.e. . . . ." Because the Board used the Latin abbreviation "i.e." ("that is") rather than "e.g." ("for example"), Dibble reads the list as exhaustive and therefore as indicating that the Board ignored all other evidence.

We disagree. Although "i.e.", when used properly, would indicate an exhaustive list, Dibble puts more weight on this abbreviation than it can bear. An unfortunate fact of modern American linguistic practice is that many Americans confuse "i.e." and "e.g." See, e.g., Bryan A. Garner, Garner's Modern American Usage 421 (2003) ("I.e. is frequently confounded with e.g. . . ."); H.W. Fowler, A Dictionary of Modern English Usage 146 (Ernest Gowers ed., 2d ed. 1965) ("Non-latinists are apt to think that it does not matter whether e.g. or i.e. is used

25

. . . .").[7] That the Board's use of "i.e." rather than "e.g." was merely a slip becomes evident upon examination of the surrounding text, where the Board immediately goes on to discuss evidence that was not mentioned in that list -- e.g., evidence of Dibble's physical confrontation with a fellow Guard member on an elevated scaffold and evidence of historical practices in issuing Letters of Reprimand. Thus, the fact that an evidentiary item did not appear in the Board's list or receive explicit mention elsewhere in the Board's report does not show that the Board failed to consider it.

Dibble's third erroneous assumption is that "undisputed" evidence is inherently weighty and persuasive. But the mere fact that a piece of evidence is undisputed reveals nothing about how relevant or probative it is. Undisputed speculation is still speculation, and evidence of meager persuasive force remains weak even if undisputed. In Dibble's case, there was ample justification for giving many of the "undisputed" pieces of evidence little weight. Many were speculation, unsubstantiated generalizations, or hearsay, e.g., Dibble's account of being told by a second person that a third person had said that he was unable to help Dibble's career because "[t]he pressure is way too

---

[7] This error is not limited to amateurs. Bryan Garner notes: "In two editions, Black's (5th & 6th) misused i.e. for e.g. in its entry for layman . . . ." Bryan A. Garner, A Dictionary of Modern Legal Usage 307 (2d ed. 1995).

tough on the top on [Dibble]." Much of the evidence at issue consists of general and conclusory statements made in a document of unspecified origin signed by twenty-two Guard members. And the "undisputed" evidence indicating that Dibble's superiors had a negative attitude toward him does not indicate whether the cause of that disapproval was Dibble's exercise of his constitutional rights or rather simply a belief that Dibble's poor military performance was detrimental to his unit's effectiveness. In sum, the "undisputed" evidence is anything but dispositive. In light of the tenuous quality of this evidence, finding it to be of little import is neither arbitrary nor capricious. And when this "undisputed" evidence is weighed against the evidence cited in the Board's report, we find no reason to conclude that the Board's decision lacked "such evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion." Falk, 870 F.2d at 945 (internal quotation marks omitted).

We have considered Dibble's several other arguments and find them to be without merit.

CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

27